# Commercial Bank of Selma *v.* Hurt.

## *Statutory Trial of the Right of Property.*

1.  *Werehouse receipts; not negotiable instruments.*—Section 1178 of the Code provides that "a receipt of a warehouseman, on which the words 'not negotiable' are not plainly written or stamped, may be transferred by the endorsement thereof, and any person to whom the same is transferred must be deemed and taken to be the owner of the things or property therein specified, so far as to give validity to any pledge, lien or transfer made or created by such person."  *Held,* that warehouse receipts are made negotiable only in the sense that their regular transfer by endorsement has the effect of a manual delivery of the property specified in them ; but are not guaranties of title, and not governed by the law-merchant,

[Commercial Bank of Selma v. Hurt.]

2. *Same; unauthorized transfer can not vest title as against real owner.* A factor, to whom cotton has been shipped for sale, having stored the same in a warehouse, and obtained receipts therefor in his own name, can not by an unauthorized transfer of the receipts, make his pledgee's title to the cotton superior to that of the true owner.

3. *Limitation of contract of pledge.*—The clause in a contract of pledge, "which cotton has been advanced upon by us to its full value," limits the operation of the pledge to the factor's actual interest in the cotton, and the transaction is not taken out of the common-law rule, which protects the owner against an unauthorized pledge by one who holds property as a factor, or agent to sell.

APPEAL from the Circuit Court of Dallas.

Tried before the Hon. JOHN MOORE.

The appellee, H. H. Hurt, brought an action of detinue against Phillips & Parrish, warehousemen, for the recovery of eight bales of cotton. Upon the sheriff taking possession of the said cotton, as required by the writ of detinue, the Commercial Bank of Selma interposed a claim thereto. Upon this claim the statutory trial of the right of property was instituted, and the following facts disclosed :

In 1890, the plaintiff in this suit, H. H. Hurt, had shipped to H. C. Keeble Co., commission merchant and factor at Selma, Alabama, eight bales of cotton, with the direction to hold the same until ordered to sell. H. C. Keeble Company received the cotton, deposited it in the warehouse of Phillips & Parrish, and took warehouse receipts in its name, H. C. Keeble Company. On October 16, 1890, H. C. Keeble Company borrowed from the Commercial Bank of Selma a large sum of money, and gave the bank as collateral security for said loan of money 298 warehouse receipts, among which were the eight receipts for the cotton sued for in this action. These eight receipts were issued in the name of H. C. Keeble Company and endorsed by said company. H. C. Keeble Company gave its note for the money borrowed from the bank and endorsed it as follows : "We hereby transfer two hundred and ninety-eight bales of cotton, marked, numbered and stored as shown in the warehouse receipts, which are herewith transferred and delivered, as collateral for the within note, which cotton has been advanced upon by us to its full value, and we hereby authorize the Commercial Bank of Selma to take actual possession of the same, at any time they may desire, and sell the same without notice, at public or private sale, applying the proceeds to the credit of this note.

[Signed]          H. C. KEEBLE COMPANY,
          H. C. KEEBLE, Manager."

H. C. Keeble Company failed on January 19, 1891, and on January 20, 1891, H. H. Hurt brought the action of detinue against Phillips & Parrish.

Upon the trial of the right of property between the plaintiff and the claimant, the issue was found in favor of the plaintiff. Claimant now brings this appeal. There were many exceptions reserved to the rulings of the lower court; but the opinion of this court renders it unnecessary to notice them in detail.

DAWSON & PITTS, for appellant.—The intention of the statute is to protect warehousemen against a mistaken or wrongful delivery, and to protect the holder of the receipt, for value, against latent equities and rights.—Code, § 1178; *Alabama State Bank v. Barnes*, 82 Ala. 616; *Howland et al v. Woodruff*, 60 N. Y. 73; *First National Bank v. Shaw*, 61 N. Y. 283. Warehouse receipts which are not marked "not negotiable" on their face, are negotiable, under the statute, and when endorsed by the party to whom issued, they pass the absolute title to the property mentioned therein to the endorsee.— *Whitlock v. Hay*, 58 N. Y. 487; *Voorhis v. Almstead*, 66 N. Y. 117; *Darden v. Dean*, 106 N. Y. 205; *Cartwright v. Wilmerding*, 24 N. Y. 521; *Moore v. Kidden*, 34 Hun. (N. Y.) 534; *Pegram v. Cowan*, 10 Bosworth, (N. Y.) 505; *Price v. Wisconsin M. & F. Co.*, 43 Wis. 267, 280-81-85; *Bishop v. Fulkluth*, 68 Cal. 607. Section 1178 of the Code has been construed by this court, and it has been held that the receipts referred to, unless the words "not negotiable" are written thereon, are transferable by endorsement and delivery.—Code, §§ 1178, 1762; *Lehman, Durr & Co. v. Pritchett*, 84 Ala. 514; *Ala. State Bank v. Barnes*, 82 Ala. 615, 616; *Allen, Bethune & Co. v. Maury*, 66 Ala. 16; *Lehman, Durr & Co. v. Marshall*, 47 Ala. 376. In this case there is no evidence that the Commercial Bank had any notice that the H. C. Keeble Co. was not authorized to transfer the cotton receipts, or that any fraud was intended to be perpetrated by the H. C. Keeble Co., and, therefore, the transfer for value, as collateral security, of the cotton receipts, by the endorsement of the H. C. Keeble Co., vested the legal title and possession of the property in the Commercial Bank.—Colebrook, §§ 411, 412, 413, 414, and notes; *Whitlock v. Hay*, 58 N. Y. 484; *Horn v. Baker*, 8 Cal. 614; *Gibson v. Stevens*, 8 How. 384. Thus, under the foregoing authorities, cotton receipts are considered negotiable instruments, and a *bona fide* transfer of them, for valuable consideration, without notice, is

[Commercial Bank of Selma v. Hurt.]

governed by the law-merchant, and the Commercial Bank is entitled to hold the cotton against the claim of the plaintiff. The Commercial Bank is a *bona fide* purchaser without notice of the title. of the appellee to the cotton sued for in this case.—*Rice v. Jones*, 71 Ala. 563 ; *Cleveland v. Sibert*, 81 Ala. 140 ; *Leigh v. Mobile & Ohio R. R. Co.*, 58 Ala. 165 ; *Blackburn v. Lehman, Durr & Co.*, 63 Ala. 550 ; Tiedeman on Com. Paper, § 289 ; 1 Daniel on Neg. Instr. pages 769-776. Proof of the *mala fides* alone will defeat the title of the Commercial Bank.—Story on Notes, §§ 197, 322 ; 4 Lawson R. & R., § 1579 ; *Spencer v. M. & M. R'y*, 79 Ala. 588; *Collins v. Gilbert*, 90 U. S. Rep. 757 ; *Welch v. Sage*, 47 N. Y. 143 ; *Hamilton v. Marks*, 63 Mo. 157 ; *Murray v. Lardner*, 2 Wallace, 110 ; *Minnell v. Read*, 26 Ala. 730 ; *Swift v. Tyson*, 16 Peters 1 ; *Fowler v. Brantley*, 14 Peters 319. A person is not chargeable with notice of a fact when reasonable enquiry on his part would discover its existence, unless the law casts upon him the duty of making such enquiry. This duty only arises when he has knowledge of other facts which are reasonably calculated to arouse suspicion.—*Kyle v. Ward*, 81 Ala. 121 ; *Shealy v. Edwards*, 75 Ala. 411 ; *Hodges v. Coleman*, 76 Ala. 103 ; *Lomax v. Le-Grand*, 60 Ala. 543 ; *Hopkins v. Layton*, 30 Wis. 379 ; *Grant v. Nat. Bank*, 97 U. S. 80 ; Bump on Fraud. Convey. (3d Ed.), 201.

GASTON A. ROBBINS and J. H. STEWART, *contra*.—There are three reasons why the defense interposed by the appellant can not be maintained. 1st. Because the statute does not give the mere transfer of warehouse receipts any of the elements of commercial paper except that of assignability. *Shaw v. Railroad Co.*, 101 U. S. 557 ; *Allen v. St. Louis Bank*, 120 U. S. 20 ; *Insurance Co. v. Kiger*, 103 U. S. 352. 2d. Because the indorsee took with notice that the indorser was not the true owner, and was, therefore, doing an unauthorized act.—*Bott v. McCoy*, 20 Ala. 578 ; *Shorter v. Frazer*, 64 Ala. 82 ; *Gillespie v. United Stock Yard Bank*, 137 U. S. 411. 3d. Because the parties had notice that the Keeble Company, on its own showing, held the cotton, at most, as collateral security for money advanced upon it.—*Allen v. St. Louis Bank*, 120 U. S. 20 ; *Insurance Co. v. Kiger*, 103 U. S. 352.

WALKER, J.—The claim of the appellant, the Commercial Bank of Selma, to the cotton involved in this suit rests upon a transfer and delivery by the H. C. Keeble Company

of warehouse receipts therefor, as collateral security for a note made by that company to the bank. The H. C. Keeble Company was a corporation engaged in business as a cotton-factor and grocery-merchant in the city of Selma. The appellee, who was the owner of the cotton, had had it shipped to that company, with instructions not to sell it until ordered to do so. The consignee had the cotton stored in the warehouse of Phillips & Parrish, and took the warehouse receipts therefor in its own name. No advances were made to the appellee on this cotton, and there is no evidence that he authorized the consignee to store it and take the warehouse receipts in its own name, or to pledge the cotton itself, or the warehouse receipts.

Under the common law, a factor or commission-merchant has no implied authority to pledge the goods of his principal for his own use. Unless the result is controlled by some statute, the attempted pledge does not work a divestiture of the title of the principal, and the party receiving such a pledge and advancing his money acquires no right to the property as against the principal, whether he knew he was dealing with a factor or not.—*Bott v. McCoy*, 20 Ala. 578; *Voss v. Robertson*, 46 Ala. 453; *Allen v. St. Louis Bank*, 120 U. S. 20; 1 Lawson's Rights, Remedies and Practice, § 229.

In England, and in several of the States in this country, statutes have been enacted for the protection of third persons who, in good faith and in ignorance of any defects of title, advance money or incur obligations on the faith of property which is apparently owned by the persons with whom they deal, who, however, in fact, hold it merely as factors or agents, having been intrusted by the owners with possession of the property or of documentary evidence of title to it.—*Saltau v. Gerdau*, 119 N. Y. 380; s. c,. 16 Am. St. Rep. 843; *Howland v. Woodruff*. 60 N. Y. 73; *Price v. Wisconsin Marine & Fire Ins. Co.*, 43 Wis. 267; *Mackey v. Dillinger*, 73 Pa. St. 85; *George v. Fourth Nat. Bank*, 41 Fed. Rep. 257. Decisions controlled by such statutes have no bearing upon this case, as we have no statute purporting to change the common-law rule which protects the owner against an unauthorized pledge of his property by one who, as factor or agent to sell, has been intrusted with the possession and custody of it. No statute is appealed to which could give any color to a claim that an unauthorized pledge by a factor of the property itself which was intrusted to him would have any other

effect as against the principal than was accorded to such a transaction by the common law.

If the H. C. Keeble Company, instead of having the cotton stored in the warehouse of Phillips & Parrish, had retained possession of it until, without any authority or license from the appellee, the cotton itself was delivered to the bank in pledge to secure the payment of the note of the H. C. Keeble Company, it is plain that the bank would not have acquired any greater title to the property than that company had to confer; and the appellee would have been entitled to recover the cotton from the bank, or to hold the bank liable for its conversion. But, it is claimed that the factor, having stored the cotton in a warehouse, and obtained warehouse receipts therefor to itself, was enabled by the transfer of those receipts to confer upon the bank a claim to the cotton which must prevail against the title of the true owner. Section 1178 of the Code is relied upon as giving this effect to the transfer of warehouse receipts by the persons to whom they are issued. The clause of that section upon which this claim is based is in the following words: "The receipt of a warehouseman, on which the words 'not negotiable' are not plainly written or stamped, may be transferred by the indorsement thereof, and any person to whom the same is transferred must be deemed and taken to be the owner of the things or property therein specified, so far as to give validity to any pledge, lien, or transfer made or created by such person."

Sections 1175, 1177, 1178 and 1179 of the Code are based upon an act approved February 28, 1881, entitled "An act to prevent the issue of false receipts, and to punish the fraudulent transfer of property by warehousemen, wharfingers and others."—Acts of Ala., 1880–81, p. 133. In the process of codification the provisions of that statute were re-drafted and somewhat modified. But the provisions of the four sections above mentioned are all in furtherance of the main legislative purpose which was indicated in the title, and in the corresponding section of the original act. So far as warehouse receipts are concerned, the purpose of the statute is, in the first place, to prevent the issue of such receipts unless the property therein described has been actually received, and is in the possession of the person issuing the receipt. This purpose is manifested in section 1175 of the Code. The purpose, in the next place, is to give definite legal recognition to such receipts as true tokens of the possession of the property described in them; and to regulate the manner in which the holder of such a token of posses-

sion may, by an assignment of it, convey his interest in the property described as effectually as he could by a transfer and delivery of the property itself. The provisions to this end are embodied in sections 1177, 1178 and 1179. Undoubtedly, it was the intention of the legislature to facilitate and throw safe-guards around dealings in personal property by the use of paper representatives of it. To this end the holder of a warehouse receipt is so far treated as the possessor of the property mentioned in it that his transfer of the receipt, in the mode prescribed by the statute, operates in the same manner as the direct delivery of the property itself would do. The transfer of the receipt is given effect as a symbolical delivery of possession. The statute does not undertake to make the receipt better evidence of title than the actual possession of the property itself. We can not conceive that it could have been within the contemplation of the legislature that the provisions of the statute would enable a thief, by depositing the stolen property with a warehouseman and obtaining a receipt for it in due form, to confer upon an innocent purchaser for value and in good faith a claim to the property, which would prevail against that of the true owner.

In *Collins v. Ralli*, 20 Hun, 246, it was held, that a New York statute, substantially identical with the provision above quoted, did not protect the purchasers for value and in good faith of warehouse receipts, when the possession of the cotton they represented by the person to whom they were issued had been larcenous. After quoting the statute, the court said: "The learned counsel for the defendants insist, that the provisions of this section afford them complete protection against a recovery in this action; that having purchased the cotton upon the faith of the negotiable warehouse receipts, and paid therefor full market value, this case falls within the spirit and the letter of the section. All the other sections of this act, except the last, which is unimportant, prohibit the issue of false receipts, etc., and prescribe the penalty for a violation of their provisions. The scope and object of the act, therefore, seems to be to protect the mercantile community against fraudulent practices by warehousemen, wharfingers and others, in respect to these receipts for goods stored, or represented to be stored with them. That this is the purpose is shown by the title of the act. . . . The clause 'warehouse receipts given for any goods . . . stored or deposited with any warehouseman,' means receipts given for goods so stored or deposited by any person having the title thereto, real or apparent, or authority of

[Commercial Bank of Selma v. Hurt.]

such person therefor.    This section of the act proceeds upon
the assumption that the receipt is so issued.    Any other
construction would enable warehousemen to issue receipts
for goods known by them to be stolen, and so convey title
to them, or even themselves to commit larceny, and by issu-
ing receipts for the stolen property defraud the plundered
owner of all title to and power of reclaiming it.   Such a
construction would work ·a change in the law hardly con-
templated by the legislature when the act under considera-
tion was passed, and yet the construction insisted upon by
the defendants would accomplish precisely this result.
Courts often have to look beyond the mere words of a
statute in determining its meaning, and give to it such an
interpretation as the mischief sought to be cured and the
evident intention of the legislature indicate." The judg-
ment in that case was affirmed by the Court of Appeals
(*Collins v. Ralli,* 85 N. Y. 637); and the decision has been
approved in subsequent cases.—*Hentz v. Miller,* 94 N. Y. 64;
*Saltau v. Gerdau,* 119 N. Y. 380; s. c., 16 Am. St. Rep. 843.

To put it in the power of a factor to give effect to an un-
authorized pledge of the property of his principal, by resort-
ing to the device of pledging. a receipt for the prop-
erty instead of the property itself, would as clearly
be an abridgement of the common-law rights of the
owner as it would be to allow a thief, by using a
receipt for the stolen property, instead of the property
itself, to defeat the common-law right of the owner to re-
claim the stolen property, in whosesoever hands it may be
found.    The statute under consideration does not purport to
deal with the right of the owner of personal property to re-
cover it from the one who claims under a disposition of it
which was unauthorized by the owner.    The object in view
being to recognize dealings in personal property by the use
of certain tokens of its possession, to prevent the issue of
such tokens except when the property mentioned in them
has actually been received by the persons issuing them, and
to regulate the transfer of the property by assignment of
the token, as a substitute for actual delivery of the property;
the statute was framed on the assumption that the posses-
sion of the property by the person to whom the token was
issued was accompanied by ownership and a right to dispose
of it, and questions presented by the assertion of a para-
mount claim to the property were not dealt with by the
statute, but were left to be determined by existing laws gov-
erning the right of the true owner of property to follow and
reclaim it in the hands of persons claiming under an unau-

thorized disposition of it by one not the true owner, but in actual possession of it.

There is evidence in section 1178 of the Code of the absence of any intention to enable the holder of a warehouse receipt, by a transfer of it by indorsement, to confer any better claim to the property than he could if he had not stored the property with a warehouseman, but had invested the person with whom he dealt with actual possession of it. Immediately after the clause already quoted from that section, is the following provision: "But this section must not be so construed as to affect or impair the lien of a landlord on such things or property for rent or advances, or to affect or impair any lien thereon created by contract, of which notice is given by registration in the manner prescribed by law." It is not to be supposed that the legislature was more solicitous to protect the rights of lien-holders than those of the owners of the property. The assumption is that it is the owner who has had the property stored and obtained a warehouse receipt for it; and the provision just quoted simply makes it plain that he can not, by a transfer of the receipt, any more than he could by a disposition of the property, accompanied by an actual delivery of possession, affect or impair liens upon it. It is further provided in the same section, that "in the event of the loss or destruction of such receipt, the warehouseman, not having notice of the transfer thereof by indorsement, may make delivery of the things or property to the rightful owner thereof; and if the things or property, or any part thereof, be claimed or taken from the custody or possession of the warehouseman under legal process, the surrender thereof may be made without delivery or cancellation of such receipt, or without indorsement thereon." The first of these two clauses shows that it was assumed that the receipt was issued to the rightful owner of the property. The second of them shows that it was no part of the legislative intention to make the fact that his receipt is outstanding a protection to the warehouseman against paramount claims to the property; or to displace, in the case of the issue of a warehouse receipt to another, the common-law rules governing the rights of the owner to recover his property from a stranger claiming under a disposition of it not binding on him. The apparent object of the statutory provisions in reference to warehouse receipts is to give them, for the purposes of commerce, recognition and credit as substitutes for the property described in them, and to give dealings in them the same effect as similar dealings with the property itself. We think that

they are made negotiable only in the sense that in their passage through the channels of commerce the law regards the property which they describe as following them, and gives to their regular transfer by indorsement the effect of a manual delivery of the things specified in them. No intention is disclosed to give dealings in them any more controlling effect upon the title to the property they represent than would be given to similar dealings with the property itself. At last, they are mere tokens of possession, and not guaranties of title by the persons issuing them. The warehouseman holds himself out as the custodian, for the legal holder of the receipt, of the property mentioned in it, but he does not warrant the title of the property against the claims of strangers to the contract of storage.

This view of the statute is well supported by pertinent authorities. By the express terms of the statute which was under consideration in the case of *Insurance Co. v. Kiger*, 103 U. S. 352, the unauthorized pledge by a factor of a warehouse receipt for the property of his principal, was ineffectual as against the principal. On that ground, the owner of the property in that case was held to be entitled to recover it, the adverse claim being under a pledge by the factor of warehouse receipts for it. But, in overruling the claim of of the pledgee against the warehouseman, based upon the provisions of the statute declaring warehouse receipts issued under it negotiable by indorsement, and making the warehouseman liable to the legal holder or owner of the receipt, for the market value of the property therein described, the court said: "There is no pretense of fraud or collusion, and we think it would be a surprise to warehousemen to be told, that when they issued their receipts for property in store, they became not only responsible as custodians of the property, but guarantors of its title to the assignees of the receipts. Such a rule would make it necessary for a warehouseman, before giving a receipt, not only to ascertain whether he had the property actually in store, but whether the title of the bailor was valid and unincumbered. Certainly this could not have been in contemplation when warehouse receipts were made by statute negotiable, and to some extent evidence of ownership." In the course of the opinion, these expressions were used: "Undoubtedly the possession of the receipts was equivalent to the possession of the property." . . . "The receipt in the hands of the company represented the cotton stored by Aiken & Watt, and gave the company the same rights it would have had if the cotton, instead of the receipt, had been handed over.

[Commercial Bank of Selma v. Hurt.]

The company got by the receipt such interest in the cotton as Aiken & Watt could by their pledge convey, and that is all Boyd & Co. agreed to deliver on the return of their receipt by the lawful holder."

In noticing a Missouri statute, almost identical in its title and provisions with the original act on which the sections of the Code under consideration were based, it was said in *Allen v. St. Louis Bank*, 120 U. S. 20–35: "None of these provisions are limited or even addressed to factors or other agents authorized to sell goods of their principals, and intrusted for that purpose with the possession either of the goods, or of warehouse receipts, bills of lading, or other similar documents in which such agents are named as consignees. But their leading object is to regulate the manner and effect of transferring warehouse receipts and bills of lading by indorsement." The meaning of the later statute which was relied on in that case was not determined by the court, except to the extent of the decision that the pledgee of the warehouse receipts, without their indorsement in writing, was not entitled to its protection.

As representatives of property, bills of lading and warehouse receipts are instruments of similar character. They are dealt with as substitutes for the property itself. The assignment of a bill of lading for value, while the goods are in transit, is limited to the effect of symbolizing their sale and delivery, and the assignee is thereby invested with all the rights of a purchaser with actual delivery of possession, but no more.—*Douglas v. People's Bank of Kentucky*, 86 Ky. 176; s. c., 9 Am. St. Rep., 276; *Moore v. Robinson*, 62 Ala. 537. In *Shaw v. Railroad Co.*, 101 U. S., 557, it was recognized that a statute declaring that bills of lading "shall be negotiable by written indorsement thereon and delivery, in the same manner as bills of exchange and promissory notes," should not, in the absence of language clearly evidencing such an intention, be construed as effecting such an innovation upon the common law right of the owner of property to protection against its misappropriation by others, that such misappropriation could be successfully made by the use of a symbol or representative of the property, when it would not prevail against the claim of the owner if the possession of the property itself had been acquired in a similar manner. In *National Bank of Commerce v. Railroad Co.*, 44 Minn. 224; s. c., 20 Am. St. Rep. 566, the proposition was stated and applied, that it is always a good defense to a carrier, even against an innocent indorsee of the bill of lading, that the property was taken from its

[Commercial Bank of Selma v. Hurt.]

possession by one having a paramount title; and it was decided that the correctness of this proposition was not affected by a statute which provided that bills of lading, or receipts for any goods, wares, merchandise, etc., when in transit by cars or vessels, "shall be negotiable, and may be transferred by indorsement and delivery of such receipt or bill of lading, and any person to whom the said receipt or bill of lading may be transferred shall be deemed and taken to be the owner of the goods, wares or merchandise therein specified," etc. Mitchell, J., delivering the opinion of the court, said of this statute: "It was not intended to totally change the character of bills of lading, and put them on the footing of bills of exchange, and charge the negotiation of them with the consequences which attend or follow the negotiation of bills or notes. On the contrary, we think the sole object of the statute was to prescribe the mode of transferring or assigning bills of lading, and to provide that such transfer and delivery of these symbols of property should, for certain purposes, be equivalent to an actual transfer and delivery of the property itself."

Our conclusion is, that it would be a perversion of the manifest purpose of the statute to construe it as having the effect of putting the symbol of the property upon a higher plane, as an evidence of title, than the actual possession of property it describes. The statute does not undertake to make the transfer and delivery of the symbol more than the equivalent of an actual transfer and delivery of the property itself.

Conceding that the clause in the contract of pledge, "which cotton has been advanced upon by us to its full value," does not show that the pledgor's character as a factor was recognized in the transaction, and that it was the intention of the parties to limit the operation of the pledge to the pledgor's actual interest in the cotton by reason of advances made upon it; we have then the simple case of a pledge by a factor of the property of his principal for his own use. The warehouse receipts which he obtained are to be regarded as the cotton itself which he held in the capacity of an agent to sell. We have no "Factors Act" to raise up a statutory estoppel against the owner, based upon his act in intrusting the factor with possession of the goods, or documentary evidence of ownership and right of disposal, and thereby leading innocent third persons to deal with the factor on the faith of his apparent ownership. There is nothing to take this case out of the influence of the common-law rule, which protects the owner of personal property against an unau-

thorized pledge of it by one who held it merely as a factor or agent to sell. The original defendants, the warehousemen, having disclaimed all interest in the suit, the plaintiff was entitled to recover his cotton, and the claim of the bank, based upon the attempted pledge by the H. C. Keeble Co., presented no legal obstacle to the plaintiff's recovery.

It affirmatively appears that the appellant was not injured by the admission of evidence of the market value of the cotton prior to the date of the transfer of the warehouse receipts. That evidence was, that in September the cotton was worth 9⅔ cents per pound. The undisputed evidence was, that the cotton was worth 9 cents per pound in December and January after the transfer of the warehouse receipts. The jury assessed the value of all of it at only nine cents cents per pound. This valuation was supported by the undisputed evidence, excluding the evidence of the higher value in September.

In view of the conclusion, that on the undisputed evidence the plaintiff was entitled to recover, it is unnecessary to consider the various charges given and refused.

Affirmed.