# American Pig Iron Storage Warrant Co. *v.* German, Executrix, *et al.*

*Bill in Equity to enforce a Pledge.*

1. *Pledge of personal property; when pledgee can maintain suit to enforce same.*—Where, after personal property has been pledged as collateral security for a debt, it is taken from the possession of the pledgee without his knowledge or consent, and an adverse claim is set up thereto, if, default is made in the payment of the debt at maturity and the property still remains in the possession of the adverse claimant, the pledgee can maintain a bill in equity to determine the rights of the parties to the property and to enforce the pledge by judicial sale.

2. *Equity pleading; pendency of creditors' bill no bar to bill by another creditor.*—A pending creditor's bill, filed by the claimant therein for himself and all other creditors who may join therein, is no bar, before decree rendered, to another bill subsequently filed by a creditor of the same debtor, who was not a party to the first proceeding.

3. *Pledge; possession necessary to give validity to pledge of property.*—Possession of the property pledged and good faith on the part of the pledgee are both necessary to constitute a valid pledge as against the rights of the creditors of the

[American Pig Iron Storage Warrant Co. v. German, Execx. *et al.*}

pledgor; but the statutes   requiring mortgages of personal property to be in writing and authorizing their registration have no application to a pledge.

4. *Same; notice of pledgee's interest given by his possession.*—Notice to the public of the pledgee's interest in property pledged as collateral security for a debt is sufficiently given by the possession of the property by the pledgee; but such possession, to be effective either for notice or to give validity at law to the pledge, must be complete, unequivocal or exclusive of the pledgor's possession in his own right.

5. *Same; same; immediate possession not essential for validity of pledge.*—It is not essential, in order to give validity to a pledge, that the delivery of the property pledged should be made at the time of the contract; since if, in accordance with the agreement between the parties, the property pledged is subsequently delivered into the possession of the pledgee, the pledge becomes valid and takes effect upon such delivery in performance of the contract.

6. *Same; same; case at bar.*—Where an iron furnace company borrows money and gives its promissory note, reciting a pledge of certain number of tons of iron, and under the agreement of pledge between the furnace company acting by its president and the pledgee, a particular spot of ground belonging to the company and located apart from its other iron yards was tendered by the president and accepted by the pledgee for the latter's own use. and the iron agreed to be pledged as security for the debt was placed on such spot of ground and was marked with paint with the pledgee's initials, there was a sufficient delivery of possession of  the  iron   agreed to be pledged, to give validity to the pledge and to act as notice to the public of the pledgee's interest in such iron.

7. *Equitable pleading; intervening petitions not subject to technical rules of pleading.*—Where, pending a suit in  equity in which a receiver has been appointed, other creditors of the defendant in the original suit intervene by petition and seek to have their rights established, such petitions are not required to conform to all  the  technical rules applicable to pleading as between the principal parties; and while the other parties in interest are entitled to notice of the filing of such petitions and an opportunity to defend, it is no demurrable objection to such petitions, when filed by leave of the court, that they do not name the other parties to the suit as defendants and they contain no formal prayer for process.

8. *Same; pledgee's right to subject property to payment of debt can not be defeated by wrong of pledgor.*—Where an iron furnace

[American Pig Iron Storage Warrant Co. v. German, Exec., et al.]

company pledges iron as collateral security for a debt, and in accordance with the agreement of the pledge puts the iron at a designated place in its yard and marks it with the pledgee's name, there is a sufficient delivery of possession to give validity to the pledge; and the subsequent wrongful removal of the iron so delivered, without the consent or ratification on the part of the pledgee, can not defeat the pledgee's right, upon default in the payment of the debt at maturity, to have such iron subjected to the payment of the debt, and this is true even though the iron so wrongfully removed was transferred to a *bona fide* vendee.

9. *Equity pleading, proceeding before register; admission of incompetent evidence*—On a reference held before a register, the admission by him of incompetent testimony will not reverse a decree which is supported by competent evidence; and a finding by the register upon testimony taken before him, will not be set aside when such evidence would support the verdict of a jury.

10. *Receiver; court has authority to authorize issuance of certificates to carry on work.*—Where an iron furnace company and its property and assets have been put into the hands of a receiver, a court has power, in the interest of the company and its creditors, to direct the discharge of threatened incumbrances and to have its accumulated raw material manufactured into marketable products; and for such purpose can authorize the receiver to contract debts and to issue receiver's certificates and to order them paid out of the iron manufactured under the management and direction of the receiver in accordance with such orders of the court.

11. *Same; expenses incident to preservation of property properly prorated.*—Where, in a suit in which a receiver was appointed, it is shown that expenses were incurred by the receiver in obedience to the orders of the court in the issuance of receiver's certificates and in employing a watchman to guard the property and iron which had been manufactured by the defendant company, under the direction of the receiver, upon a final decree in such case. it is proper to pro rate the expenses thus incurred, between the parties to the suit, according to the value of their respective properties, which were involved and protected.

APPEAL from the Chancery Court of Shelby.

Heard before the Hon. JAMES R. DOWDELL.

This is an appeal by the American Pig Iron Storage Warrant Company from a certain decree in the chancery

court of Shelby county, establishing and enforcing against it, in favor of the appellees, certain pledges of iron made by the Alabama Iron & Steel Company, and decreeing against appellant in respect to certain receiver's certificates and equities arising thereon and imposing upon appellant a part of the cost of administration of the property of the Alabama Iron & Steel Company.

The present appeal is the sequel of the litigation growing out of the insolvency of the Alabama Iron and Steel Company, commenced by a bill filed by one of its directors, under a resolution of its board, praying the chancery court to administer the assets of the insolvent corporation, etc. Subsequently, other bills and petitions were filed by interested parties, claiming priorities and liens upon the property of the corporation, and seeking to assert rights to some iron manufactured by the receiver in the cause. First and last, there were five bills and two petitions filed. All of these were heard together, and one decree was rendered on the several claims and rights of the parties, as regards the matters involved in this appeal. The five bills and the two petitions were filed as follows:

First. What is known as the E. T. Peter bill, No. 471, filed May 21, 1894, by the complainant in the capacity of a director of the Iron and Steel Company, under a resolution of its board of directors. This bill alleged the insolvency of the company, and asked the court to take charge of and administer the assets of the corporation. The only parties defendant were the Iron & Steel Company and French Nabors, a simple contract creditor. On the day the bill was filed, the defendant answered admitting the allegations; and by consent T. J. Peter was appointed receiver. The order of the Register appointing him, is set out in the record.

Second. On June 1, 1894, Thomas M. Fancher and Henry Burke, who were unsecured creditors, filed their bill No. 472, asserting the invalidity of certain mortgages on the property of the corporation, not material to the issues of this cause, and alleging the invalidity of the pledges of iron made to the appellant. It made parties defendant the Warrant Company, the Iron & Steel

Company, The Central Trust Company, the trustees of the mortgage and receiver. On the same day the Register made an order which recites that it appearing that all the property and assets of said corporation are now in the hands of T. J. Peter as receiver, concludes "That the said receiver keep and hold possession of the property heretofore taken possession of by him under the previous orders of the honorable court and hold the same subject to the claims of the complainants in this cause, as they may be ultimately determined.".

Third. On July 4, 1894, F. C. McKeever, who was also a simple contract creditor, filed his bill No. 474, in which he alleged that the bills filed by E. T. Peter and Fancher and Burke were collusive, and alleging the invalidity of both the mortgages to the Central Trust Company, and the pledges of the iron deposited in the yards of the Storage Company. It made parties defendant all the parties to the two former bills. On July 9th, 1894, the Register made an order which recites the possession by T. J. Peter as receiver under the former order of the court, and orders that the said receiver "keep and hold the possession of the property taken possession of by him under the former order of the court," and orders that the said receiver "keep and hold the possession of the property taken possession of by him under the previous orders of the court, and hold the same subject to the claims of the complainants in this cause as they may be ultimately determined."

Fourth. On the 7th day of July, 1894, Peter, as receiver, filed a petition in the causes Nos. 471 and 472, (which were the E. T. Peter and Fancher & Burke bills) in which he recited his appointment in case 471 and the extension of the receivership to 472, and averred that among the other assets of the corporation was a "large amount of material consisting of charcoal, lime rock, iron ore, and other material procured before the appointment of a receiver for the purpose of manufacturing pig iron." The petition further avers that, in the opinion of the receiver, it would be to the interest of all parties interested in the assets of the corporation, for him to be

allowed for the purpose of raising the necessary funds to use up the material, and to pay certain debts which were liens on some of the assets, and to repair the furnace, to issue receiver's certificates for an amount not exceeding seventeen thousand dollars, and to make up the material into iron, and then sell the iron and pay off the certificates.

Fifth. On July 7, the chancellor made an order in causes 471 and 472 (the Peter and Fancher bills) which recites that "notice of said petition and of the nature and character thereof, and of the time and place set for the hearing of the same has been given to the several attorneys, representing the various parties complainant and defendant in the above causes, and that the parties consent to the granting of said order as prayed therein," authorizing the receiver to create an indebtedness not exceeding seventeen thousand dollars, for the purpose of paying off the liabilities mentioned, and for operating the furnace of the Iron & Steel Co., and to issue there for certificates payable by the first of January, 1895, which "certificates shall be a first lien upon all of the iron that may be manufactured by the receiver, and the proceeds thereof." A form of certificate was prescribed by the order, which provides that the certificates shall "be a first lien upon all the iron manufactured by me as receiver on the furnace of the Alabama Iron & Steel Company and upon the proceeds thereof; the produce of said furnace and the proceeds thereof being pledged for the payment of this and all other certificates issued under the said order." The certificates involved in the Lamar petition were issued under this order.

Sixth. The American Pig Iron Storage Warrant Co. was not a party to the E. T. Peter bill, and was not represented in the Fancher bill, until August 2d, 1894, when it filed its answer in the latter cause, which was nearly a month after the order allowing the issue of receiver's certificates, and long after the certificates were in fact issued.

Seventh. The receiver never took possession of the yards of the Storage Company until they were surrendered under an order of the chancellor, dated July 16,

1894, and filed in the office of the register on July 18, 1894.

Eighth. On October 2d, 1894, Joseph Verchot filed his bill which recites the filing of the bills above mentioned, claims a first lien on seven hundred tons of iron, which it alleges are in the hands of the receiver, and prays that the iron be subjected to the alleged liens, and on January 24, 1895, the chancellor made an order extending the receivership of Peter to the bill, and orders "that the receiver hold all of the property, funds and proceeds of the Alabama Iron & Steel Co. in his hands, or which may come into his hands as such receiver, subject to discharge the liens of the parties in all of said suits described in this bill in their regular order or priority."

Ninth. On March 14, 1895, P. E. Williams et al. filed their bill, alleging that they were unsecured creditors of the Iron & Steel Company, reciting the former bills, and denying the validity of the bonds issued by that company, or the validity of the pledges of the iron stored in the yards of the Warrant Company, and made parties defendant all parties to the former bills, and other parties not necessary to be mentioned in this statement. This bill prayed that the assets of the Iron & Steel Co. be marshaled, the bonds declared void, and the iron subjected to the claims of the unsecured creditors, and that the receivership granted in the other bills be extended to this case. On March 17, 1895, the chancellor made an order that the receivership granted in the other causes "is hereby extended over this cause."

Tenth. On September 18, 1897, R. H. Pfaff filed his petition in the consolidated cause made by the bills set out above, and asserted that certain iron which had been pledged to one C. S. Plumb, had been transferred to him, and that the iron thus pledged was in the possession of the receiver, and asked that he be decreed to have the first lien on the iron, and have it sold for his benefit. This petition is in relation to what is known as the Plumb iron, and the order made on the petition is one of the matters involved in this appeal.

Eleventh.   On September 16, 1897, L. & E. Lamar *et als.* filed their petition, in which they alleged that they were the holders of certain receiver's certificates issued under the order of July 7, 1894, and further that the receiver had certain property in his possession which was subject to the lien of these certificates, and prayed that certain iron claimed by the Warrant Co. be subjected to their lien.   The order made is one of the matters involved in this appeal.

The E. T. Peter, the McKeever and the Williams bills were dismissed without prejudice to the petition of Lamar, and the Burke and Fancher bill was dismissed for want of prosecution.   No further attention need, therefore, be given them, except as to what occurred in them affecting appellant, prior to the dismissal of these bills.

### VERCHOT CASE.

The original bill in this cause was filed by Joseph Verchot on October 2, 1894, against the Alabama Iron & Steel Company, the American Pig Iron Storage Warrant Company, and others, and sought to subject 790 tons of iron then in the yards of the Warrant Company, to the payment of these debts due him by the Alabama Iron & Steel Company.

The bill alleged that at various times between the 11th day of September, 1893, and the 9th day of October, 1893, the Alabama Iron & Steel Company had borrowed of one E. B. Nelson, his transferor, and of said Verchot the sum of $7,000, and had pledged to said Verchot 700 tons of iron to secure the same; that the iron thus pledged had been delivered to him, and marked with his initials, J. V., and that all of said iron remained in his possession and under his control, until, without his knowledge or consent, and in his absence, the same was moved by T. J. Peters, the president of the Alabama Iron & Steel Company, and placed in the yard of the American Pig Iron Storage Warrant Company; and that E. T. Peters, acting for or attempting to act for the Warrant Company, had certified that the iron had been stored in said yards, and the Warrant Company had issued its warrants for said iron, and on said warrants the Warrant Company, or some one else, claimed to have

loaned money to said Iron Company. The bill averred that the rights of such persons were subordinate to those of complainant.

The bill further alleged that on May 21, 1894, E. T. Peter, as a director of the Iron Company, had filed his bill, No. 471, against said company, alleging the insolvency of the company, and praying the court to take charge of the assets of the company and administer the same, and for the appointment of a receiver. That on the day the bill was filed, T. J. Peters, the president of the Iron Company, was appointed receiver. That the only parties to this bill were the Iron Company and French Nabors, a simple contract creditor, and that the receiver, T. J. Peters, acting under the orders of the court, took possession of the 700 tons of iron pledged to complainant.

The bill further alleged that on June 1st, 1894, Thomas M. Fancher and Henry Burke, who were unsecured creditors of the Iron Company, filed their bill, No. 472, in behalf of themselves, and all other unsecured creditors. That the last bill set up the invalidity of certain mortgage bonds, (not material to be further noticed), and averred that in the progress of its operation the Iron Company manufactured a large amount of pig iron, amounting to twelve or thirteen thousand tons, of the value of $168,000, which pig iron is now stored at Briarfield, in Bibb county, on the property of the Iron Company, and that the Warrant Company now claims that the said iron was pledged by the Iron Company to secure certain notes to various parties, amounting in the aggregate to $110,000, and alleged that the pledges claimed were never made by the Iron Company, and that upon petition the receivership was extended to all these bills.

The bill further alleged that on July 4, 1894, one F. C. McKeever, as a simple contract creditor, filed his bill, No. 474, in which he alleged that the mortgages were invalid, and the pledge of the pig iron was invalid and void. That by order of the court the three cases made by these bills were heard together, and the receivership

was extended to cover all these bills. Verchot further alleged that the Iron Company was hopelessly insolvent, and Verchot claiming a prior right to the 700 tons of iron, prayed that he be allowed to assert his rights by a sale thereof to pay his debts.

Copies of the notes given at the time the money was borrowed are attached to the bill, and with the exception of dates and signatures, were as follows:

"$1,000.             BRIARFIELD, ALA.,........, 1894.

"One year after date........promise to pay to ourselves or order, the sum of one thousand dollars, without defalcation, for value received, having deposited herewith, and pledged as collateral security to the holder hereof the following property viz.: [here follows a description of the iron] with authority to the holder hereof to sell the whole of said property, or any part thereof, or any additions thereto .......... at public auction or private sale ............."

To this bill there was a demurrer filed by the Warrant Company on November 18, 1894, on the following grounds: 1. Because it appeared from the bill of complaint that the complainant had a plain, adequate and complete remedy at law, in that the property he claims to have a lien upon, is still in existence and still under the control of T. J. Peter, who, as the general managing agent of the Iron & Steel Company, pledged the pig iron, and now has the custody of the same as receiver.

2. It appears from the bill of complaint that at least three creditors' bills have been filed in the same court, touching the same property, and asking for the marshalling of the assets of the Iron & Steel Company, under which complainant claims; and complainant states no facts to show why he can not have full relief by proper petition filed in either of said pending suits, and particularly in the suit No. 472, brought by Thomas M. Fancher and Henry Burke v. The Alabama Iron & Steel Co. *et als.*

3. From the statements of said bill of complaint it appears that the said iron claimed by complainant was stored in the ware-yards of the Warrant Company without notice to the registrar of the Warrant Company, and warehouse receipts were issued by the War-

rant Company therefor, representing the pig iron, and that such warrants have been pledged by the Iron & Steel Company to purchasers for value, and without notice of the equity of complainant therein.

4. Because it appears that the iron named in the bill and claimed by complainant was so mingled with other iron stored in the storage yards of the Warrant Company at Briarfield as to be incapable of identification, and that complainant's only remedy is at law.

This demurrer was overruled. The Warrant Company answered the bill on the 20th of March, 1895. In its answer it admitted that the Alabama Iron & Steel Company, some time before the 18th of May, 1894, deposited with it in its yards at Briarfield, 500 tons of iron, not 700 tons, for which this respondent says it executed to the Alabama Iron & Steel Company its warrants, in the nature of warehouse receipts, acknowledging the receipt of said 500 tons in 100 ton lots. It denied that the Warrant Company, or E. T. Peters, its agent, or any other agent in its employment, knew when said warrants were issued for the 500 tons, or for any other lot of iron, or that it had any notice, knowledge, or information that Verchot had any claim to, or interest in, the said iron, or any other iron so stored with it. It denied that Verchot, or any one for him, ever had the custody, possession or control of the iron claimed by him, and averred that the iron so stored by it had been in the possession, custody and control of the Alabama Iron & Steel Company, its agents and employes. It further averred that Verchot left all of said iron, if he ever had any claim thereto, in the custody and control of the Alabama Iron & Steel Company, and that it was not designated or pointed out in any way so as to identify the same, or to distinguish it from other iron belonging to the Alabama Iron & Steel Company, and it charges and states that by so leaving the said iron in the custody and control of the Alabama Iron & Steel Company it had put it in the power of the said Alabama Iron & Steel Company to obtain, by means of the warrants or receipts so issued to the said

Alabama Iron & Steel Company money by hypothecating such warrants with lenders, and that the said Alabama Iron & Steel Company so hypothecated the iron stored with the Warrant Company, who knew nothing about any claims said Verchot had to and in such iron.

The answer further alleges that since said warrants were executed as aforesaid, and since the suit was commenced, the Warrant Co. had been informed and therefore charges, that when the iron now claimed by Verchot was put in the storage yard, the said Verchot and the said Iron & Steel Co. agreed that the said iron should be weighed in the storage yard of the Warrant Company, and that warrants or receipts should be executed therefor, and that the Iron & Steel Co. should take such warrants and hypothecate or pledge the same for money to be paid to the said Verchot in settlement of the debt of the Iron & Steel Co. to the said Verchot, the evidences of which debt are attached to the bill as exhibits. The answer then states that of the said agreement the Warrant Co. had no notice, knowledge or information when it issued the said warrants for the iron claimed by Verchot; that it had no notice, knowledge or information when the Iron & Steel Co. received the money upon the hypothecation of the said warrants, that the money so received by it was to be paid to said Verchot; that the agreement between the Iron & Steel Co. and Verchot constituted the said company or the said T. J. Peter, the agent or trustee for Verchot, to raise money on said iron, for the benefit of Verchot, and to pay the demands claimed in the bill of complaint, and the answer then charges that by virtue of this agreement all the right, title and interest of Verchot in the iron, if he had any, became vested in the holders of the warrants, which were issued when the iron was weighed into the yards.

The answer denies that 700 tons of iron in which Verchot was interested or which had been pledged to him, had been weighed into the storage yard of the Warrant Co.; and avers that whatever iron was weighed into its yards was not kept separate and apart from the other iron of the Iron & Steel Co., and that said

iron has no marks of identification; but that the same was mingled with all other iron therein stored, and was not distinguishable therefrom, and was received by the Warrant Co. without notice or knowledge of the claim of Verchot, and it denies that Verchot has a lien on the iron superior to the lien of any other person by virtue of his contracts, which are made exhibits to his bill. The answer charges that whatever lien Verchot may have had, by reason of these contracts, that he waived and forfeited the same when he consented that the iron should be stored with the Warrant Co., and that the warrants issued therefor should be sold to raise money to pay his demands. The answer further denies that there ever was as much as 11,600 tons of iron stored with it.

On March 17, 1896, the Warrant Co. amended its answer by leave of the court, in which after denying that the Iron & Steel Co. had deposited iron in its storage yards at Briarfield, as alleged in the bill, avers that in all the Iron & Steel Co. deposited with it in its three storage yards at Briarfield, Ala., iron to the amount of about 11,600 tons, for which as warehouseman this respondent issued its warrants in the nature of warehouse receipts, acknowledging the delivery to it of iron in 100 ton lots. The answer then denies that either it or its agent, E. T. Peter, or any other agent in its employment, knew when said warrants were issued for any of said iron as aforesaid, or for any other lot of iron at Briarfiled or elsewhere, that the iron so deposited did not belong to the Iron & Steel Co., and denied any notice, knowledge or information that the said Verchot had in his life time any claim or interest in said iron or any other iron stored with it. The amended answer further denies that Verchot or any one for him ever had the custody, possession and control of the iron mentioned in the bill, but avers that the iron remained in the possession of the Iron & Steel Co., its agents and employés, and it was left there by the said Verchot. It further alleges that the said iron was not designated or pointed out in any way so as to identify it, or to distinguish it from

other iron belonging to said Iron & Steel Co., and charges that by so leaving the said iron in the custody and control of the said Iron & Steel Co., Verchot put it in the power of the Iron & Steel Co., by hypothecation or pledge of ware-yard receipts therefor with lenders, to obtain money thereupon. The answer further alleges that the Warrant Co., about the time the bill was filed, had been informed by the managing agent of the Iron & Steel Co. in substance as follows: That the Iron & Steel Co. has pledged to Verchot iron to the amount of 700 tons; but never in fact had that much iron on hand to pledge to said Verchot. That when said iron to the amount of about 700 tons was pledged to Verchot, it was in a separate place under the control of the Iron & Steel Co., and that afterwards Verchot and the Iron & Steel Co. (Verchot then pressing the Iron & Steel Co. for the money which it owed him) agreed that the Iron & Steel Co. should have weighed into the storage yards of the Warrant Co. the iron which the Iron & Steel Co. had pledged to Verchot, and that warrants of the Warrant Co. should be issued to the Iron & Steel Co., which that company would pledge and obtain money by such pledging to pay the said Verchot; and that pursuant to the agreement, the Iron & Steel Co. moved the iron, to the amount of 500 tons so pledged to said Verchot, into the storage yard of the Warrant Co. at Briarfield, and received the warrants of the Warrant Co., which it pledged for money; but that the money so derived was not paid to Verchot. It is then averred that the Warrant Co. had no knowledge or notice, or information of what particular lot of iron that may have been so weighed into its yards, if any was so weighed into its yards, to which Verchot had claim.

The answer further alleges that the Warrant Co. has made every possible effort, taking as a guide the description of the iron in the bill of complaint to identify the iron therein named, and has been wholly unable from inquiring of its agents, and from its records kept strictly of all iron weighed into its yards, marked and numbered, to identify the iron claimed by Verchot, and it denies that any such iron was ever weighed into its yard.

The answer then alleges that for every 100 ton lot of iron weighed into its yards it issued a warrant to the Iron & Steel Co., in the nature of a warehouse receipt, and that the Iron & Steel Co. pledged every warrant so issued to it for value or for money presently obtained as a loan, and that the parties furnishing the money did so without any knowledge, notice or information that Verchot had any claim, right, title or interest in any of the iron so weighed into the Warrant Co.'s yards at Briarfield, and that each of the parties so receiving the warrants as pledges is a purchaser thereof without notice and for value. The answer then sets out a list of persons to whom the warrants are pledged.

On October 11, 1898, the chancellor rendered a decree declaring the complainant entitled to relief, ascertaining the amount due to be $9,825.00, and adjudged that the pledge to Verchot was superior to all other liens on the 700 tons of iron, and taxed the Iron & Steel Co. and the Warrant Company with the costs of the proceedings.

### PETITION OF PFAFF.

R. H. Pfaff, on September 18, 1897, filed his petition showing that he was a creditor of the Iron & Steel Co. to the amount of $5,000, which indebtedness arose as follows: Mrs. C. S. Plumb in the fall of the year 1893 loaned to the Iron & Steel Co. $5,000, for which notes of the company were given, secured by the pledge of one hundred tons of iron for each $1,000 loaned; and said Iron & Steel Co. leased to Mrs. Plumb a tract of land to be used as a storage yard, and that the iron pledged to secure each of these notes was placed on the said yard.

The petition further alleged that without the knowledge or consent of Mrs. Plumb, and while she was in the possession of the iron and of the yard on which it was deposited, one Thos. J. Peter, who was at the time president and manager of the Iron & Steel Co., removed from said yard 623,750 pounds of the iron to the yard

of the Warrant Co. at Briarfield, which yards were also leased by the Warrant Co. from the Iron & Steel Co.

The petition also alleged that the iron thus removed was still on the yard of the Warrant Co., and that the latter company claimed some right thereto. Petitioner alleged that for a valuable consideration and in good faith Mrs. Plumb had transferred the notes of the Iron & Steel Co. to him, and that he was the owner of the same, and claimed a lien on the iron mentioned superior to the lien of the Warrant Co. or any other person, and prayed an order directing the receiver to turn over to him the iron pledged to secure the notes.

On July 12, 1898, an amended petition was filed, which set up the same facts as the original, and with more fullness of detail alleged that between January 10th and January 16th, 1894, T. J. Peter, who was at the time president of the Iron & Steel Co., removed from the yard in the possession of Mrs. Plumb, 317 tons of the iron pledged to her, and deposited the same in Yard 38, Section C of the Warrant Co., which yard had been leased by the Warrant Co. from the Iron & Steel Co., and was not far distant from the yard of Mrs. Plumb.

The petition further alleged that after the iron was removed to the yard of the Warrant Co., it was marked H., CC. and DD.; but that before the iron was removed from Mrs. Plumb's yard it was marked P., the initial letter of her name; that all of the iron so removed came into the possession of the receiver, and was in his possession at the time of the filing of the petition, and located in the same position to which it was removed; that since the filing and service of the petition the Warrant Co. had removed, or caused to be removed, about 100 tons of the iron which had been marked H, to its storage yard at Rome, Ga., but had left in lieu thereof 100 tons of other iron; that after said iron was deposited in the yard of the Storage Co., under the circumstances above set out, that company wrongfully detained the same under a pretended claim thereto.

The petition further alleged that for a valuable consideration Mrs. Plumb transferred and assigned in good

faith to petitioner the four notes mentioned in the pleadings, together with the iron pledged to secure the same, and that petitioner was then the owner of the same.

The petition further alleged that by reason of the wrongful detention of the 317 tons of iron by the Warrant Co., and the failure of said company to return the same to petitioner, the iron had greatly depreciated in value and was not sufficient to pay the debt secured thereby, and that by reason of the delay thus occasioned, petitioner had been greatly damaged, over and above the present value of the iron, to the extent of three thousand dollars. The petition made the Warrant Co. a party respondent, and prayed that it be required to account for the iron received by it, and to pay the damages caused by its failure to turn the iron over to petitioner.

On March 8, 1898, the Warrant Co. answered the petition. It denied that Mrs. Plumb ever loaned the $5,000 as stated in the petition; denied that the Iron & Steel Co. ever leased to Mrs. Plumb a tract of land in Briarfield to be used as a storage yard, or that in any other way she acquired or owned or used any storage yard for the storage of iron at that place. The answer further denied that the Iron & Steel Co., to secure any note or indebtedness to Mrs. Plumb, ever pledged any iron to secure a note of the date specified in the petition. It then denied the pledge of any iron to scure the notes alleged to have been given to Mrs. Plumb, on the date they bear, and alleged that the said Alabama Iron & Steel Co., at no time deposited, on any yard, any iron as security for any indebtedness such as is named in the petition to the said C. S. Plumb, as the consideration of the loan of money by her to that company or for any indebtedness of the Iron & Steel Co. to the said C. S. Plumb then presently accrued and owing.

The third paragraph of the answer denies that T. J. Peter without authority, for and on account of the Iron & Steel Co., or on his own account, or in any way or manner whatever, or for any account whatever, depos-

ited in the storage yards of the Warrant Co., on Jan. 12th to 16th, 1894, 275 tons of iron that at any time belonged to or was pledged to or hypothecated with Mrs. Plumb or any one else for her account as a security for any indebtedness that the Iron & Steel Co. owed Mrs. Plumb. (The petition states the quantity of iron in pounds, and the answer in denial gives the quantity in tons.) It further denied that Mrs. Plumb ever had the custody or control of such iron so alleged to have been deposited on any yard belonging to her, and that the same, if any such iron was deposited, never had been from under the control of the said Iron & Steel Co., or of said T. J. Peter.

The answer denied that on the 18th day of September, 1897, any iron to which Mrs. Plumb had any claim or ever had any claim, or that had been pledged to her, was then in the storage yards of the Warrant Co., at Briarfield, or that any such iron is in the storage yards at the time of answer. The answer further denies that Mrs. Plumb for a valuable consideration, or for any consideration whatever, transferred the notes alleged to have been made to her to Pfaff, and denies that Pfaff has any lien for the payment of the promissory notes described in the petition, or to, or on any iron that was in the storage yards of the Warrant Co. at Briarfield.

The answer further set up that long prior to the date of the promissory notes described in the petition, the Warrant Co. owned and controlled three yards at Briarfield, and that from time to time prior to the date of these notes, and during the fall and winter of 1893-4, and in the spring of 1894, the Iron & Steel Co. had deposited in one or the other of these storage yards many 100 ton lots of iron, and that during that time more than 3,000 tons of iron had been deposited in said yards by the Iron & Steel Co., and that for each 100 ton lots so stored with the Warrant Co. it had given the Iron & Steel Co. a certificate giving a description, grade and quantity of the iron so stored, that the iron so stored with it was kept for hire, and was not to be delivered to the said Iron & Steel Co. or the purchaser

therefrom, except upon the payment of storage, and up-
on the return and cancellation of the receipts given
therefor; and that for each certificate of iron deposited
with it the Iron & Steel Co. had obtained from the
warrant Co. a storage yard receipt, called a warrant,
which recited the facts of such storage, the grade,
quantity and quality of such iron to be delivered, upon
the endorsement and cancellation of such warrant and
the payment of the storage thereon, to the person own-
ing or holding such warrant.

The answer further alleged that for all of the iron so
stored, certificates had been given, and for such certifi-
cates warrants had been issued by the Warrant Co.;
and that the Iron & Steel Co. had attached these war-
rants to their promissory notes and borrowed money
thereon, or sold its promissory notes for money, having
such warrants given for the iron so stored as collateral
security therefor, pledging the same with authority to
the holder of said promissory notes to sell said collat-
eral, upon the non-payment of the money due and owing
upon said notes; and that all of the iron stored with
the Warrant Co. by the Iron & Steel Co. was, before the
filing of said petition, and long before May 21st, 1894,
pledged by the Iron & Steel Co. to sundry and divers
persons for the loan of money.

The answer further sets up the date of the delivery
to it of each 100 ton lot for the dates mentioned in the
petition, gives the number of the warrant issued for it,
and the name of the purchaser of said warrants, and
avers that they purchased the same without any notice
or knowledge of the claim of Mrs. Plumb, and paid value
for them.

The Warrant Co. also demurred to the petition of
Pfaff, on the following grounds:

"1.   That the said amended petition is defective in
this, that the Market and Fulton National Bank of New
York, and the National Bank of Orange County, New
York State, at Goshen, in said State, are necessary par-
ties defendant to said petition amended.

"2.   To so much of said petition as charged that this
defendant wrongfully detains the iron in said petition

named, this defendant demurs for that said charges as made are mere conclusions.

"3. For that said petition, as amended, shows no demands were ever made of this defendant for this iron alleged to have been stored in its yard C, 38.

"4. It is nowhere alleged in said amended petition that this defendant knew when said iron was so stored in its said yard that petitioner had notice or knowledge of the claim of C. S. Plumb, or of any other person thereto."

On March 18th, 1898, the chancellor referred the matter to the register, to report on the truth of the allegations of the petition.

On June 30th, 1898, the register reported that 300 tons of iron were in the hands of the receiver, which were subject to a first lien in favor of Pfaff.

On July 5th, 1898, exceptions were filed to the report of the register, and on October 11th, 1898, the court rendered a decree ascertaining the amount due to Pfaff to be $6,825.00, and decreeing a first lien on 300 tons of iron marked respectively "H," "CC," and "DD."

PETITION OF LAMAR.

On September 16, 1897, a petition was filed by Law Lamar and Earnest Lamar, partners, doing business as L. & E. Lamar, and Minthorne Woolsey, and alleged that the iron in the yards of the Warrant Company had been hypothecated to the Warrant Company and to other persons to secure the payment of debts alleged to be due from the Iron & Steel Company to them. The petition then alleged that acting under the order of the court, made July 11th, 1894, the receiver issued receiver's certificates to the amount of $17,000.00, which certificates were made a first lien upon all the iron manufactured by the receiver. It is alleged that L. & E. Lamar are the holders of these certificates to the amount of $4,700.00, and that Woolsey is the owner of $500.00 of them.

The petition further alleges that subsequent to said order of July 11th, 1894, T. J. Peter, as receiver, manufactured the material on hand into iron, and sold the

same, and applied the proceeds to other debts of the Iron & Steel Company, which action it is charged constituted a conversion of the property to their damage; and asked that a reference be had to ascertain *what dispostion had been made of the fund derived from the sale of the iron,* and that a lien be declared on *the property benefitted by these expenditures* for the reimbursement of the holders of receiver's certificates issued under the decree of July 11th, 1894.

It was alleged that the iron on hand which had been manufactured by the receiver amounted in value to about $800, and that the certificates outstanding under the decree of July 11th, 1894, amounted to about $7,250.00.

On September 17th, 1897, the Warrant Company and the holders of the warrants issued for the iron, answered the petition, demanding proof to be made as to the amount of iron manufactured by the receiver, denying the conversion of the proceeds of said iron as charged in the petition, and denying that any of the iron in the possession of the Warrant Co. was subject to the lien of the receiver's certificates or the hands of petitioners.

On March 18th, 1898, an amendment to the petition was filed which made 'Frank Moore a party complainant to the petition, and set up his ownership of $1,500 of these receiver's certificates by transfer from Mrs. Carrie S. Plumb, who loaned the money, evidenced thereby to the receiver. The amended petition then set up that T. J. Peter had sold all the iron manufactured under the decree of July 11th, 1894, with the exception of about 40 tons outside of the storage yards of the Warrant Co. at Briarfield, and a further quantity then alleged to be in what was known as yard "C," the exact amount of which petitioners did not know, and prayed a reference to ascertain the same. The prayer of the amended petition was that the amount of the funds arising from the sale of what is called Receiver's iron, be ascertained, and that the holder of the certificates be decreed to have a lien on the

*property benefitted by these expenditures* for their reimbursement, superior to all other liens.

On the same day the Warrant Company and the holders of the warrants issued by it, filed their answer to the petition, denying that any of the iron in possession of the Warrant Co. or for which it has issued certificates, was made by T. J. Peter as receiver, or that said Peter, as such receiver, ever stored any iron made by him in storage yard "C" at Briarfield, or that any such iron was so stored, and that any money arising from the sale of said receiver's iron had been issued in such a way as to constitute the same a charge on any iron in the possession of the Warrant Co., or its warrant holders, and setting up that Peter has sold all the iron manufactured by him as receiver, and that whatever claim or demand petitioners may have were claims against the said Peter personally, and not against the pig iron aforesaid stored in said storage yards. The answer further set up that the receiver had received on May 21, 1894, personal property to the amount of $5,000, on which there was no lien in favor of petitioners, and that the receiver had not kept separate accounts of the money derived from the sale of the personal property, but had mingled the one with the other so that they could not be distinguished. The answer then further set up that the Warrant Co. was, prior to the year 1894, doing and engaged in a storage and warehouse business as a bailee for hire, and prior to May 21st, 1898, upon the delivery into the storage yards at or near Briarfield, Ala., in 100 ton lots from time to time by said Iron & Steel Co., said Warrant Company issued to the Iron & Steel Co. its storage yards receipts called warrants for each 100 ton lots, and that the said Iron & Steel Co. executed its commercial paper, each containing a clause in and by which it pledged one or more of said warrants as security for the money named, to be paid in each of said notes made by it, and that the Iron & Steel Co. sold such commercial paper from time to time for value. That the defendants became the purchasers of such commercial paper in open market for value, and that at the time they be-

came such purchasers they had no notice, knowledge or information of any lien, claim or demand in favor of petitioners or others. The defendants further say that all their rights to the iron pledged to them accrued before May 21, 1894, and that the debts for which warrants were pledged to them accrued before May 21, 1894, and that the iron for which the warrants were pledged to them was issued, was in the storage yards when Peter was appointed by the chancery court, and that such receiver took charge of said iron as such receiver, and that whatever iron said receiver put into said storage yards he must have removed the same, as only the same amount remained in said yards at his death, as shown by the warrants.

There was incorporated in this answer a demurrer to the petition on the following grounds: 1. Because the facts alleged therein do not show that money to which petitioners had a prior claim became invested in and for account of the pig iron stored in the storage yards of the Warrant Co. 2. Because the facts alleged do not fix on the pig iron named in said petition a lien in favor of petitioners. 3. Because the statements of the amended petition show only that petitioners have a personal demand against T. J. Peter or his estate. 4. That there is no certainty as to the amount of receiver's iron alleged to have been stored in said yard.

On the same day (March 18, 1898) the court made an order directing the receiver to pay to the petitioners the proceeds of forty tons of iron and the sum of $1,285.61, out of funds received from the sale of a steam shovel.

On July 4th, 1898, the register reported that he had paid to the petitioner $1,162.50, the proceeds of the forty tons of iron, and $1,285.61 out of the proceeds of the steam shovel, and ascertaining the amount due to petitioners on that day of $7,280.28, divided as follows: Lamar, $5,085.83; Woolsey, $549.72, and Moore, $1,643.73.

The register then found and reported that T. J. Peter, as receiver, expended out of the proceeds of iron to manufacture which the receiver's certificates were is-

sued, the various sums which constituted a charge, as hereinafter stated, against the 11,600 tons of iron, which was in the storage yards of the Warrant Co., amounting in all to $1,418.06. The register further found and reported that the iron then in the yards marked BBB and RR and 100 tons marked XXX, was iron which had been manufactured by the receiver, and that of the iron then in the possession of the receiver, the 300 tons marked "E," "F," and "G," were charged with a first lien in favor of petitioners; but that such iron should bear its proportion of the expenses for watchmen among this and other iron, and there would remain the sum of $1,270.86, which would be a proper charge against the iron which had been moved out under the former order of the court at the instance of the Warrant Co.; that the said balance of $1,215.66 should be taxed against the Warrant Co.

The final decree of October 11, 1898, followed the report of the register, and decreed in accordance with its findings.

The final decree rendered October 11, 1898, so far as it is necessary to set out here, was in words and figures as follows:

"It is ordered, adjudged and decreed that the demurrers of the several respondents to the amended petition of the said R. H. Pfaff, be and the same is hereby overruled and held for naught; that the demurrers of the several respondents to the amended petition of L. & E. Lamar, and others, be and the same is hereby overruled and held for naught. It is further ordered and decreed that the exceptions by the respondents to the report of the register in the petition of R. H. Pfaff be, and the same are hereby overruled, there being in the opinion of the court sufficient legal and competent testimony to sustain said report, and said report is hereby in all things confirmed. It is further ordered and decreed that the exceptions of the respondents to the report of the register in the petition of L. & E. Lamar, and others be and is hereby overruled, there being in the opinion of the court sufficient legal testimony to sustain said report, and said report is hereby in all things confirmed.

"In the opinion of the court, the complainant, Marie L. E. German, as executrix of Joseph Verchot, deceased, and R. H. Pfaff, petitioner in said cause, and L. & E. Lamar and others, petitioners in said cause, are entitled respectively to the relief sought by them in their respective bill and petitions as hereinafter decreed.

"It is, therefore, considered, ordered, adjudged and decreed that the Alabama Iron & Steel Company is indebted to the complainant, as the executrix of the estate of Joseph Verchot, deceased, in the sum of seven thousand ($7,000.00) dollars, with interest thereon, by and under the seven certain pledge notes described in the bill of complaint in this cause, as alleged therein, the amount of which being of easy calculation and ascertainment is here calculated, found and decreed to be the sum of nine thousand, eight hundred and twenty-five ($9,825.00) dollars, for which said indebtedness seven hundred tons of iron, as alleged in said bill, were pledged as therein alleged to secure the said indebtedness, which said seven hundred tons of iron is now represented by the seven hundred tons of iron set aside under the decree of September 18th, 1897, of this court, known as 100 tons marked B. B. B., 100 tons marked ZZ., 100 tons marked XX., 100 tons marked UU., 100 tons marked R. R., 100 tons marked O. O., and 100 tons composed of the marked Y. Y. and V. V. The two marked Y. Y. and V. V., together aggregated 100 tons, and which said seven (700) tons of iron in the hands of the receiver has been ordered to be sold and the proceeds thereof stand in lieu of the said iron by that certain decree of the court rendered in term time on the 16th day of September, 1898, under agreement of parties filed in open court on the 16th day of September, 1898.

"It is accordingly further considered, ordered, adjudged and decreed by the court that the American Pig Iron Storage Warrant Company and the Alabama Iron & Steel Companies, bodies corporate, pay all the costs of complainant's suit, including the costs and charges herein allowed, and decreed to the receiver of this court for and on account of the said seven hundred tons of

iron, for which let execution issue; that from the pro-
ceeds of said seven hundred tons of iron which the re-
ceiver shall sell under the said decree and agreements
of parties of September 16th, 1898, after the deduction
by him therefrom of actual cost of loading the said 700
tons of iron on cars in the sale thereof, and the sum of
three hundred and ninety and 39-100 dollars, together
with the five per cent. (5 per cent.) of the proceeds of
said sale of the said seven hundred tons of iron, which
said sum of $390.39 and said five per cent. is the reason-
able compensation for his services and expenses in and
about the keeping, preserving, selling said iron, keeping
the proceeds and paying out the same he shall receive
sixty-four and forty-one one-hundredths dollars, to be
paid, or so much thereof as may be necessary to be paid,
to the petitioners, L. & E. Lamar, or their solicitors of
record, for and on account of said seven hundred tons
of pig iron, upon the contingency hereinafter men-
tioned and provided for, and in the event such contin-
gency does not arise and such payment be not made of
sixty-four and 41-100 dollars, then the same, or so much
thereof as may not have been so paid, shall be paid by
the said receiver to the said complainant, or her solicit-
ors of record.   *    *    *    *    *

"It is further considered, ordered, adjudged and de-
creed by the court, that the Alabama Iron & Steel Com-
pany is indebted to the petitioner and intervenor, R.
H. Pfaff, in the sum of five thousand ($5,000.00) dol-
lars with interest thereon, by and under four certain
pledge notes described in his original and amended pe-
tition in this cause, as alleged therein, the amount of
which being of easy calculation and ascertainment, it
is here calculated and found and decreed to be the sum
of ($6,835.00) sixty eight hundred and thirty-five dol-
lars for which said indebtedness was pledged three
hundred tons of iron now represented by the three hun-
dred tons of iron set aside under the decree of Septem-
ber 18th, 1897, of this court, known as 100 tons marked
'H,' 100 tons marked 'CC,' and 100 tons marked 'DD'
and which said three hundred tons of iron have been
ordered to be sold and the proceeds thereof stand in

lieu of the said iron by that certain decree of the court rendered in term time on the 16th day of September, 1898, under agreement of parties in open court on said day.

"It is accordingly ordered, adjudged and decreed by the court that the American Pig Iron Storage Warrant Company and the Alabama Iron & Steel Company, bodies corporate, pay all the costs incident to petitioner Pfaff, petition and proceedings thereunder, including the costs and charges herein allowed and decreed to the receiver of this court for and on account of the three hundred tons of iron, for which let execution issue; that from the proceeds of the said three hundred tons of iron which the receiver shall sell under the decree and agreement of parties of September 16th, 1898, after the deduction by him therefrom of the actual cost of loading the said three hundred tons of iron on cars in the sale thereof and the sum of one hundred and sixty-seven and 31-100 dollars together with five per cent. (5%) of the proceeds of said sale of the said three hundred tons of iron, which said sum of $167.31 and said five per cent. is the reasonable compensation for the said receiver's services and expenses in and about the keeping, preserving and selling said iron, keeping the proceeds thereof and paying out of the same so much thereof as may be necessary to be paid to the petitioners, L. and E. Lamar, Minthorne Woolsey and Frank Moore, or their solicitors of record for and on account of said three hundred tons of iron, upon the contingency hereinafter mentioned and provided for, and in the event such contingency does not arise and such payment be not made of said $27.61, or so much thereof as may not have been so paid, shall be paid by the said receiver to the said petitioner Pfaff, or his solicitors of record * * *

"It is further considered ordered, adjudged and decreed by the court that the amount due, with interest to the date of this decree, to the said L. & E. Lamar on their said receiver's certificates described in their amended petition and owned by them, is five thousand, one hundred and fifty and 16-100 dollars; that the amount due with interest to the date of this decree to

[American Pig Iron Storage Warrant Co. v. German, Execx. *et al.*]

said Minthorne Woolsey on his said receiver's certifi-
cates described in his said amended petition and owned
by him is five hundred and fifty-six and 30-100 dollars,
and that the amount due with interest to the date of
this decree to the said Frank Moore or his said receiv-
er's certificates, described in his said amended petition
and owned by him is one thousand, six hundred and six-
ty-three and 73-100 dollars, which sums constitute first
liens and charges of equal dignity, aggregating at this
date seven thousand, three hundred and seventy and
28-100 dollars on the remainder of the proceeds of the
said steam shovel now in the hands of the court through
its receiver, on the proceeds of three hundred tons of
iron in the custody of the court through its said receiver,
known as that marked 'E. F. and G.' which said three
hundred tons are ordered to stand in lieu of the three
hundred tons of iron known as that marked 'BBB,'
'RR,' and 'XXX' subject, however to the costs of the
proceedings under this petition, and the reasonable ex-
penses and charges which the receiver is entitled to re-
ceive for his services in and about the keeping and sell-
ing the said three hundred tons of iron, 'E. F. and G.';
but such charge on the said proceeds of the said iron for
the costs of the petition of L. & E. Lamar, Minthorne
Woolsey and Frank Moore and the proceedings thereun-
der, and incident thereto is not to be understood as ab-
solving the said American Pig Iron Storage Warrant
Company and the Alabama Iron & Steel Company,
bodies corporate, from paying all costs incident to this
said last named proceeding, which said costs are hereby
considered, adjudged and decree in favor of the said peti-
tioners, L. & E. Lamar, Minthorne Woolsey and Frank
Moore of and against the said American Pig Iron Stor-
age Warrant Company and the Alabama Iron & Steel
Company, bodies corporate, for which let execution regu-
larly issue against them; that the said petitioners, L. &
E. Lamar, Woolsey and Frank Moore are entitled to
charge certain other lots of iron and the said American
Pig Iron Storage Warrant Company and Jas. E. Pope,
Jr., and H. P. Pope, personally for iron which was re-
moved or caused to be removed by them to the limited

extent and under the circumstances hereinafter mentioned and decreed; that the receiver pay to the petitioners, L. & E. Lamar, Minthorne Woolsey and Frank Moore, or their solicitors of record, the remainder of the proceeds of the said steam shovel which he now holds, and such payment operates as a credit on the said respective balances owing the said L. & E. Lamar, Minthorne Woolsey and Frank Moore, *pro rata,* according to the said respective balances owing each, and the said respective balances are hereby further credited with the sum of twenty-seven and sixty hundredth dollars ($27.60) on account of the proportion of the burden which the said three hundred tons of iron 'E. F. & G.' should and ought to bear, and it is hereby decreed to bear, as its proper proportion of the expenses of this court in watching and keeping it while in the hands of this court under its first receiver, T. J. Peter." (There then follows directions as to the sale of the iron and distribution of the receipts therefrom, in accordance with the preceeding portions of the decree.)

From this decree the American Pig Iron Storage Warrant Company appeals and assigns the rendition thereof as error.

THOMAS G. JONES, CHAS. P. JONES, EDWIN F. JONES and W. C. WARD, for appellant.—1. It is indisputable, under all the authorities, that in order to prefer a pledge, these things at least must concur:

(a)   There must be a delivery of the property pledged to the pledgee, and a parting of all control over the subject of the pledge by the pledgor in his own right.

(b)   There must be an actual and substantial possession taken by the pledgee or some one for him; and this possession must be continuously asserted and maintained up to the time the pledge is enforced, or it is lost as against a creditor or purchaser for value.

(c)   The change of possession to affect strangers must be evidenced by acts so visible and plain, as to *warn* every one who deals with the property that the custody has changed hands. Equivocal or doubtful acts of the pledgor or pledgee, though they may hold a pledge be-

tween the parties, are utterly futile as to third persons.

See Jones on Pledges, §§ 23, 27, 28; *Morris v. Reading*, 167 Mass. 322; *Bodenheimer v. Newsom*, 5 Jones Law, 107; *Casey v. Cavaroc*, 96 U. S. 467; *Reeves v. Capper*, 5 Bing. (N. C.) 136; *Sholes v. Asphalt Co.*, 183 Pa. St. 528; *McCoy v. Lassiter*, 95 N. C. 88; *George v. Martonni*, 56 Pac. Rep. 53; *George v. Pearce*, 55 Pac. Rep. 775; *Hooks v. Ayers*, 80 Fed. Rep. 978; *Textor v. Orr*, 86 Md. 392; *Mahoney v. Hale*, 66 Minn. 463; *Bank v. Caperton*, 74 Miss. 857; *Geilfus v. Corrigan*, 95 Wis. 651; *Ins. Co. v. Iron Co.*, 81 Fed. Rep. 439; *Williams v. Gillespie*, 30 W. Va. 591; *Pierce v. Lanaux*, 25 L. R. A. 577; *Tool Co. v. Woodruff*, 41 N. J. Eq. 336.

2.  It may also be stated as elementary law that the *title* to property pledged remains in the pledgor until a sale under the pledge. Applying the principles of law here stated to the facts, the first question to arise is what is "possession." Possession has been defined to be the detention or enjoyment of a thing which a man holds or exercises by himself or by another, who keeps and exercises it in his name. *It implies exclusive enjoyment.* 18 Am. & Eng. Enc. of Law, p. 840. It implies the present right to deal with the property at pleasure and to exclude other persons from meddling with it.—*Sullivan v. Sullivan*, 66 N. Y. 41. It implies power and dominion in keeping and disposing of the thing, to the exclusion of any similar power or dominion in another. There must be actual control of the thing—manucaption, if it be capable of such subjection. The pledgee must hold, control, and have sole power of disposition. *Weeden v. Clarke*, 94 Ala. 505; *George v. Martonni*, 56 Pac. Rep. 53; *Wells v. Mortgage Co.*, 109 Ala. 430; Jones on Chattel Mortgages, § 187; *Sheldon v. Warner*, 26 Mich. 403; *Flagg v. Pierce*, 58 N. H. 348; *Brunswick v. McLay*, 7 Neb. 137; *Doyle v. Stephens*, 4 Mich. 87; *Steele v. Benham*, 34 N. Y. 634; *McCarthy v. Grace*, 23 Minn. 182.

We maintain that the evidence fully shows: First, that neither iron nor land was ever in the possession of Verchot or Mrs. Plumb. Second, that they never had open, notorious possession, or exclusive possession, which would put any one on notice of their pledge.

[American Pig Iron Storage Warrant Co. v. German, Execx. *et al.*]

Third, that the evidence affirmatively shows that T. J. Peter was left in the undisturbed possession of the lands ·called the Verchot and Plumb yards, and he and he alone ·ever exercised any acts of ownership over the lands or the iron.—*Doyle v. Larker*, 16 U. S. C. C. 263 ; *Dempsey v. Gardner*, 127 Mass. 381 ; *Moore v. Redding*, 167 Mass. 332.

3. Verchot ·claims as pledgee, the American Pig Iron Storage Warrant Company and the warrant holders claim as pledgees ; the former as being in actual possession of the iron pledged, the latter as being in possession by symbols in the form of storage yard receipts. It is the law that, where the same thing is sold to two different persons by contracts equally valid, and the second vendee is without notice of the first sale, "he who first obtains possession is entitled to the property."—62 *Am.* Dec. 354, 358, ·citing *Landfear v. Summer*, 17 Mass. 110 ; *Lamb v. Durrant*, 7 Am. Dec. 30 (12 Penn. 64) ; *Shaw v. Levy*, 17 Serg. & R. 99 ; *Fletcher v. Howard*, 2 Aik. 115 (16 Am. Dec. 686) ; *Jewett v. Lincoln*, 14 Me. 116.

4. The fundamental error of appellee's whole position is that he steadily ignores the vital fact that this litigation is not between. pledgee and pledgor, but between two persons, each claming to. be pledgee of the .same property from the same person. He also ignores the inexorable rule that possession by the pledgee is necessary to keep the pledge alive, and forgets the rule ·that where one of two innocent persons must suffer, that person who places it in the power of the guilty party to work a fraud must suffer, rather than one who did not create the situation which rendered the fraud possible. When ·one of two innocent parties must suffer, he who is most at fault must bear the loss, is the ·common language of the books.—*Allen, Bethune & Co. v. Maury*, 66 Ala. 10.

5. The whole system of receiver's certificates is of comparatively recent origin, and first appears to have been considered in this State in the case of *Meyer v. Johnston*, 53 Ala. 237, where the principles which underlie the assertion of such power by the courts are fully and ·elaborately discussed. In that case the issue of certifi-

cates is put largely on the ground that the property in the possession of the court was a railroad charged with a public duty which must be performed even at the expense of the lien holders, and also from the necessity of preventing the property from going to ruin, pending the decision as to who was entitled to it.

The question whether or not the courts have authority to issue certificates in the case of strictly private corporations has never been passed on in this State. It is expressly denied by Judge GRESHAM in *Loan and Trust Company v. Grape Creek Coal Co.,* where he says: "When it becomes necessary for a court of chancery to take possession of property which is the subject of litigation by placing it in the hands of a receiver, all expenses incident to its safe keeping and preservation are properly chargeable against it, and if there be *no income* such expenses shall be paid out of the corpus, before *distribution* to lien or other creditors. It does not follow, however, that because the property of a *private* corporation or a natural person may be thus protected and preserved before sale, that in order to raise money to operate it for a profit, a court may place a charge upon it in advance of existing lien. * * * * The power does not exist and the application is denied."

The same doctrine is asserted by Judge PAUL in *Fidelity Ins. v. Shenandoah Iron Co.,* 42 Fed. Rep. 378, where he says: It is, owing to the *quasi* public character of such companies, confined to railroad companies. See all *Laughlin v. U.. S. Rolling Stock Co.,* 64 Fed. Rep. 25; *Hanna v. State Trust Co.,* 70 Fed. Rep. 2; *Raht v. Attril,* 106 N. Y. 423. The majority opinion in *Drennen v. Mercantile Tr. & Dep. Co.,* 115 Ala. 614, does not militate in any way against the views here advanced, as applied to the case at bar.

. The only Alabama authority cited by appellees' consul in argument is *Beckwith v. Carroll,* 56 Ala. 12, where it is decided, that when it becomes necessary for a court of equity to take charge of property through a receiver in order to preserve it from waste, the property becomes chargeable with the expenses thus incurred including the compensation of the receiver, and

the party who under the final decree of the court becomes entitled to the property, takes it *cum onere*, although it may not be sufficient to pay his entire debt or claim. The cases of *Thornton v. Highland Ave. & Belt R. R.*, 94 Ala. 353, and *Highland Ave. & Belt, R. R. v. Thornton*, 105 Ala. 225, do not militate against this view.

6. The lien of the Warrant Co. existed at the time the receiver was appointed, and if the iron was still the property of the Iron & Steel Co. and as such property in the hands of the receiver, that officer took it subject to the lien. This point is expressly decided in *Ellis v. Marks*, 86 Tex. 109, where it is said: "The receivership does not destroy any liens which may have been acquired before his appointment, but the remedy for their enforcement should be sought in the court in which the whole estate is being administered. The same principle is asserted in *Meyer v. Johnston, supra*, where it is decided that after acquired property came under the lien of the mortgage subject to all the equities of other parties as against the mortgagor.

7. How was the court to know there was no income save by a settlement with its officer? Until the income was exhausted, the court had no authority to fix a charge on the corpus, much less to displace a lien. The holders of receiver's certificates can in no event have any equity against the Warrant Company, or its iron, until the receiver's accounts are settled.—*Jones v. Dawson*, 19 Ala. 672; *Pollard v. Cleveland*, 43 Ala. 102.

8. As to the claim of L. & E. Lamar, as to the expenditure of the money, the law conclusively presumes that the receiver paid the money out of his own funds, and not out of the funds of the estate.—Thompson on Corp., §§ 7108, 7109; *Meyer v. Johnston*, 53 Ala. 237. Petitioners have no claim on storage iron to pay their debts.

The defendants had no notice of the order of July 7 authorizing the receiver to issue receiver's certificates to pay for making iron, or to make iron. They were not parties defendant to the E. T. Peter suit, or to any suit for that matter. Consequently as to them the receiver's

certificates are without force and void—*Meyer v. Johnston,* 53 Ala. 237, 346.

Order to issue receiver's certificates can only be issued upon hearing and notice.—Thompson on Corporations, §7182.

Such certificates do not displace the liens of those who are not parties and those who have not had notice. These defendants never had an opportunity to contest the matter of the certificates held by petitioners.—Thompson's Commentaries on Corporations, § 7187. It was the duty of the receiver to restore the trust funds, but out of his own estate.—Thompson's Com. Corp. §§ 7084, 7108. The rightfulness of the contention of these defendants had been established by the documentary proof offered by petitioners. That the litigation was wrongful was demonstrated by the voluntary dismissal of the E. T. Peter suit No. 471, under which the receiver was appointed. So went the other suits. Whenever the receivership is wrongful the party procuring the appointment of the receiver is responsible for costs and expenses of the receivership. It would be intolerable that a court of equity should wrongfully seize the securities of a creditor, dismiss the suit in which the receivership was created, and then pay the expenses of the wrongful litigation out of the property of an innocent party.—20 Am. & En. Encyc. Law, pp. 179, 181, 183; *Weston v. Watson,* 45 Hun. N. Y. 149; *French v. Gifford,* 31 Iowa, 228; *Verplank v. Mercantile Ins. Co.,* 2 Paige 438, and other cases there cited; Gluck & Black on Receivers, pp. 461, 462, § 105, note 5; *People v. Jones,* 33 Mich. 308.

9. *Bona fides* of defendant is not infected with usury. Complainant seeks to charge defendants with usury to destroy the claim of purchase for value without notice. There is no evidence to support such a charge. Usury exists in the intent, and arises when there is a corrupt taking of a larger rate of interest than allowed by law. 2 Brickell's Dig., 124, § 71.

10. But the demands—the subject of the suit—are usurious. Come with clean hands at least when you demand the aid of a court of equity. All the contracts of pledge made exhibits to the bill, except "A.," are usurious on their face. Each provides that, if payment is

made before maturity, the obligor must pay interest at the rate of 12 per cent. per annum, for that there is a "stipulation even for a chance for advantage beyond legal interest * * * * and courts will not lend their aid to enforce an unlawful contract.—*Miller v. Life Ins. Co.*, 54 Am. St. Rep., 746. This takes away the *bona fides* of Verchot, and he was not a *bona fide* purchaser for at least six-sevenths of the amount he claims.—See *Wailes v. Couch*, 75 Ala. 134; *McCall v. Rogers*, 77 Ala. 352; *Smith v. Lehman, Durr & Co.*, 85 Ala. 394; *Hart v. Adler*, 109 Ala. 467, 470, quoting: "There is a solecism on the face of the expression, '*a bona fide* purchaser' in usury," and "A contract based on a consideration which is against the pronounced policy of the law has an element of *mala fides* in it." Such being the fact, how can relief be given to complainant again the warrant holders for value and without notice? *In equali jure melior est conditio possidentis.*

The liability of the Warrant Co., bailee, ceases as to L. & E. Lamar when they are shown to be the holders and claimants of the iron which has been delivered to them, no other claimant opposing. It is the duty of the warehouseman to keep with reasonable safety the goods stored with him,—23 Am. & Eng. Encyc. of Law, p. 64,—*and he is liable for ordinary care (Ib.* p. 64,) and must redeliver to his bailor on demand.—28 Am. & Eng. Encyc. of Law, p. 657; *Marks v. Robinson*, 82 Ala., 69, 83; *Nelson v. Iverson*, 17 Ala. 216. To this day complainant has not pointed out any particular lot of iron and said "That is mine." She has demanded that 10,300 tons of iron should be kept for her to contest the right to 700 tons. All the iron Lamar has received since May 21st, 1894, was delivered by the receiver of this court. "If the goods have been taken from the bailee by legal process, or by overwhelming force, he is excused from liability."—28 Am. & Eng. Ency. of Law, 659; 46 Am. Dec., 145, 147; 24 Am. St. Rep., 156.

BROWNE & DRYER, JOHN B. KNOX, FRANCIS L. PETTUS and H. F. REESE, *contra*.

THE VERCHOT CLAIM.

1. There was sufficient delivery to Joseph Verchot of the iron covered by his pledge notes. If the iron had merely been separated from the other lots of iron and left upon lands not delivered into the possession of Verchot, but the written evidences of pledge, with descriptions of the separated iron contained in them, delivered to him, that would have been sufficient.—*Chaplin v. Rogers*, 1 East. 192; 2 Benjamin an Sales, 911, §§ 1043, 1044. In cases of pledge "such delivery is sufficient wherever it would be so in a case of the sale of the same property."—18 Amer. & Eng. Encyc. of Law, 595, note.

And in cases of sale "the law only requires such a delivery as is consistent with the nature and situation of the things sold, and so where the goods are ponderous or bulky, or cannot conveniently be delivered manually, or where they are not in the personal custody of the seller, actual delivery is dispensed with and symbolical or constructive delivery will suffice."—21 Amer. & Eng. Encyc. of Law, pp. 550, 554.

2. The lien will not be lost if the pledgor gets possession wrongfully and without the pledgee's assent, and his right to redress is not confined to the pledgor, who so wrongfully obtains possession, but extends to the one who has received it from such taker.—18 Amer. & Eng. Encyc. of Law, pp. 598, 599, 655, 656, citing *Noles v. Marable*, 50 Ala. 366; *Com. Bank of Selma v. Hurt*, 99 Ala. 137.

3. Even if notice were necessary, it has been fully proved. The American Pig Iron Storage Warrant Company, under the device of charging one-fourth of 1 per cent. "brokerage," discounted the notes in New York, where they were payable at the rate of 6½ per cent. interest. The complainant introduced the interest table in the certified Acts of 1892-3 to prove the New York rate of 6 per cent.—Code of 1896, § 1823; *Camp v. Randle*, 85 Ala. 240. This alone charged the American Pig Iron Storage Warrant Company with notice.—*McCall v. Rogers*, 77 Ala. 352; *Wailes v. Couch*, 75 Ala. 134. And the American Pig Iron Storage Warrant Company is not chargeable with constructive only, but actual notice. The conspiracy between the American Pig Iron Storage

Warrant Company and the Alabama Iron & Steel Company in the issuance of false certificates at Briarfield, and the making up of the deficiency as best they could, makes every act of either conspirator the act of all in the furtherance of the common design. The American Pig Iron Storage Warrant Company, through its local yard master and its supervising yard master, was *particeps criminis.—Jasper Trust Co. v. R. R. Co.*, 99 Ala. 417; *Southern Express Co. v. Bank of Tupelo*, 108 Ala. 517.

4. "Whether a mortgagor has purposely or carelessly mingled other goods with his own so that they are not distinguishable, the result is the same. If he sells the whole, the mortgagee may replevy the whole from the purchaser, upon the failure of the latter to identify the specific articles not embraced in the mortgage. If the mortgagor consign such goods to a third person for sale, the mortgagee is entitled to recover of the consignee the value of the whole when sold.

"And so if a purchaser of mortgaged goods mixes his own goods with them and refuses to separate them, the mortgagor may take all of the goods without being a trespasser. The foundation of the doctrine of confusion of goods is the affording of protection to innocent owners. The loss and inconvenience arising from such confusion is therefore thrown upon the party who causes the confusion, and it is for him to separate his own property or lose it."—Jones Chat. Mort., § 481; 6 Amer. & Eng. Encyc. of Law (2d ed.), pp. 594, 596, 598; 2 Amer. & Eng. Encyc. of Law (1st ed.), p. 883; 5 Amer. & Eng. Encyc. of Law (2d ed.), pp. 226, 227; 11 Amer. & Eng. Encyc. of Law (1st ed.), p. 1068.

5. The court having, through its receiver, taken possession of the iron upon which complainant had a lien, the fact that complainant did have such lien and the fact of the American Pig Iron Storage Warrant Company being a foreign corporation, the prevention of the splitting up of a cause of action and the prevention of a multiplicity of suits are some of the equitable features which give the complainant the right to come into chancery. And that court having taken jurisdiction upon

these equitable grounds, will settle all matters between the parties, granting full relief in the premises, including the awarding of damages for the wrongful act of any of the parties with reference to the subject matter of the suit; and this, although there is an adequate remedy at law to recover such damages.—*Scrubbs v. Drivers' Exec.,* 31 Ala. 274; *Price v. Carney,* 75 Ala. 546; *Lyon v. Powell,* 78 Ala. 351; *Freider v. Lienkauff & Strauss,* 92 Ala. 472; 1 Pom. Eq. Jur., §§ 181, 231, 232, 237, 241, 242; *Chambers v. Cannon,* 62 Texas, 293; 2 Story's Eq. Jur., § 799.   Courts of equity will grant damages for the wrongful taking and withholding of property in cases where the return of the property is rendered impracticable by the act of the wrong-doer, and in cases where the return of the property would not afford complete relief by reason of any fact or circumstance arising from, or caused by the act of the wrong-doer. Consequently, the iron having been of sufficient value to have paid complainant's whole debt at the time of the wrongful taking and assuming control over it, if the proceeds thereof should prove insufficient to pay the said debt, by reason of the diminished value of iron and the increased amount of the debt by interest during the detention, and complainant's inability to regain the iron on account of this controversy, the complainant is entitled to a personal decree against the American Pig Iron Storage Warrant Company for the full amount of her debt and costs, to be credited with the proceeds of the 700 tons of iron when sold; and also against L. & E. Lamar to the extent of the value of the Verchot iron which the proofs show they received, which decree against the Lamars is to be so guarded as to prevent a double satisfaction on execution.—*Teal et al. v. Chancellor,* 23 So. Rep. 651; 117 Ala. 612; *Peabody v. Tarbell,* 56 Mass. 226; *Andrews v. Browne,* 57 Mass. 130; *Pingree v. Coffin,* 78 Mass. 288; *Atty.-Gen'l. v. Deerfield River Bridge,* 105 Mass. 1; *Milkman v. Ordway,* 106 Mass. 232; *Holland v. Anderson,* 38 Mo. 55; *Combs v. Scott,* 76 Wis. 662.

### THE PFAFF CLAIM.

6.   The execution and delivery of the lease to Mrs. Plumb invested her with the possession of the land.

Even to pass a greater estate than that of tenancy for years, livery of seizin is not necessary.—Code of 1896, §§ 1019, (1823), 1037, (1841). A lesser degree of formality would have been sufficient. When goods are pondrous, delivery of indicia of property is sufficient, they being separated from like things when in bulk. Such is the rule in sales, and the rule is the same for delivery in pledging.—2. Benj. Sales, §§ 1043, 1044, p. 911; 18 Am. & Eng. Enc. Law, p. 595, note; 21 Am. & Eng. Enc. Law, pp. 550, 554. If it were expected that a man should shoulder and carry off 300 or 500 tons of iron, chivalry at least should prevent contention that a woman should. Even prosaic law says marking and setting aside goods as belonging to the vendee is sufficient to constitute delivery.—7 Am. & Eng. Enc. Law (2d ed.), p. 3.

The lien will not be lost if the pledger gets possession wrongfully and without the pledgee's assent, and the pledgee's right to redress is not confined to the pledgor, who so wrongfully obtains possession, but extends to the one who has received it from such taker. —18 Am. & Eng. Enc. Law, pp. 598, 599, 655, 656, citing *Noles v. Marable,* 50 Ala., 366.

7. The want of notice to the American Pig Iron Storage Warrant Company or to the Market & Fulton Bank is entirely immaterial. It is not law that property can be surreptitiously taken from an innocent lien-holder and repledged, thus giving to a third person rights superior to the first. If such were the law, there would be no such thing as protection to, or stability of title in, property. Any person in his absence might be despoiled of his property or rights, and be remediless; provided the trespasser takes care to deliver the goods to another who has no notice of the wrongful taking. Again, the property might be seized, and disposed of, and the person who thus invoked the protection of such law, would find at last that he has done so to his own distruction; for he would probably discover that he has not only lost the goods he hoped to gain, but his own property also. The courts not only have refused to sanction such a

proposition, but have adopted the rule that even a factor, actually intrusted with the possession of goods, and authority to store them, has no authority to pledge them, and such pledge avails nothing against the title of the owner. This conclusively settled all discussion on the only point relied on by the adversary counsel.—*Commercial Bank of Selma v. Hurt,* 99 Ala. 134; *Commercial Bank of Selma v. Lee,* 99 Ala. 493. When the American Pig Iron Storage Warrant Company issued false warehouse receipts, it not only violated the first principles of honesty, but the express provisions of statutory law.—Code of 1886, § 1175. The American Pig Iron Storage Warrant Company dissociates itself from its local agent, E. T. Peter. His territory was local, but his authority in all these respects general. He was acting directly within the scope of his powers as an agent, but wrongfully to the injury of Mrs. Plumb, to whose rights and remedies petitioner succeeded.—*Jasper Trust Co. v. K. C., M. & B. R. R. Co.,* 99 Ala. 416; *So. Express Co. v. Bank of Tupelo,* 108 Ala. 517.

L. & E. LAMAR CLAIM.

8. The chancellor's decree will not be reversed on error on account of the admission of irrelevant evidence, when the record shows there was sufficient legal evidence to sustain his conclusion.—*Powers v. Dickie,* 49 Ala. 81; *Goodrich v. Goodrich,* 44 Ala. 670. The proceedings in the causes of which the petition was a part was a history of the transactions of the parties leading to the issuance of these receiver's certificates for money borrowed by the court, and the reports of the receiver of how he expended it were made in the line of official duty, and were properly admitted in evidence by the register. Where these reports are untrue, either party may, of course, so show.—Code of 1896,, §§ 744, 1809; 1 Greenleaf Ev., §§ 115, 116, 147, 148, 150.

9. Where the register in his investigations, have the witnesses present before him he has advantages in weighing the testimony which neither the chancellor nor this court can enjoy. All reasonable presumptions will be indulged in support of his rulings; and the decrees of the chancellor confirming his report will not be reversed

[American Pig Iron Storage Warrant Co. v. German, Execx. *et al.*]

unless the conclusions of the register are clearly wrong —unless the preponderance of the evidence is so strong, that a judge at *nisi prius* would feel authorized to set a verdict aside rendered on similar testimony.—*Munden v. Bailey,* 70 Ala. 68; *Lehman v. Levy,* 69 Ala. 50; *Smith v. Vaughan,* 78 Ala. 202; *Winter v. Banks,* 77 Ala. 410; *Glover v. Hembree,* 82 Ala. 328; *Mahon v. Williams,* 39 Ala. 221.

10.    The primary object of a receivership is to preserve the fund or thing in question from removal beyond the jurisdiction, or from spoliation, waste or deterioration, pending the litigation, so that it shall be appropriated as the final decree shall appoint.—20 Am. & Eng. Enc. Law, 11. · In performing its necessary obligations thus assumed by the court, the expenses incurred by the court are burdens necessarily on the property taken possession of, and this irrespective of the question who may be the ultimate owner, or who may have the preferred lien, or who may invoke the receivership.— *Kneeland v. Am. Loan & Trust Co.,* 34 Law Co-Op. U. S., 383; *Beckwith v. Carroll,* 56 Ala. 12.

11.    The Warrant Company agreed to and it and its warrant holders acquiesced in the order of the court, under which it incurred this receivership debt; actively influenced the court in shaping the course of the litigation; induced the issuance of receiver's certificates, which they accepted, and proved their claims under the invitations given in the bills and decretal orders of the court; accepted the benefits arising from a diversion of the proceeds of the receiver-made iron; and procured the court to render decrees in their favor permitting removal of nearly nine-tenths of the iron under a representation to the court that the costs and charges of keeping it (paid for by the court out the proceeds of the receiver-made iron) was great and accumulating.    Under such circumstances those parties are in no condition now to dispute the superiority of the liens of the holders of these receiver's certificates upon the *corpus* of the estate which came into the custody of the court.—*Highland Ave. & B. R. R. Co. v. Thornton,* 105 Ala. 225;

*Thornton v. H. A. & B. R. R. Co.*, 94 Ala. 353; *Cake v. Mohun*, 41 Law Co-op. U. S., 447; *Kneeland v. Am. Loan & T. Co.*, 34 Law Co-op. U. S., 379; *Beckwith v. Carroll*, 56 Ala. 12.

"Contracts made with a receiver in his official character, within the scope of his duties and the limits of his authority, are not binding on him personally. If such were the case, no one would accept the responsible office of a receiver." So a loan made under an invitation of the court is not a loan to the receiver, but, through him, to the court. "The party contracting with the receiver looks to the *rem,* the fund or property *in gremio legis,* backed by a pledge of the court that it shall be liable for all costs and expenses legitimately incurred in pursuance of its orders and decrees." Nor is the lender a guarantor of the wisdom of the court in borrowing, nor responsible for the application of the funds loaned; since they have passed beyond his control and into that of the court. It is not the policy of a court of equity to borrow money and not repay it. If the income proves insufficient, the *corpus* of the property in the hands of the court will be resorted to.—*Beckwith v. Carroll,* 56 Ala. 12; *Thornton v. Highland A. & B. R. R. Co.,* 94 Ala. 253.

SHARPE, J.—This case is the remaining one of four suits at one time pending between the Alabama Iron & Steel Company and its creditors, in which there was a common receivership. The other three suits have each been dismissed without trial, but the receivership, together with certain intervening claims to property in the recever's charge, still survives to be disposed of with this suit.

The litigation originated under circumstances substantially as follows: The Alabama Iron & Steel Company, a domestic corporation, was, for several years, engaged in the manufacture and sale of charcoal pig iron. The appellant, the American Pig Iron Storage Warrant Company, a corporation having its principal office in New York city, did a warehouse business which consisted mainly in the storage of pig iron. Its yard, No. 38, was located near the furnace of the Alabama Iron &

Steel Co. (which we will refer to hereafter as the Furnace Company) near Briarfield, Ala., and was divided into three sections, designated respectively as "A," "B," and "C." Under its regulations iron, when stored in it was placed in separate piles, each containing one hundred tons, and marked with letters to identify its location, and with figures to designate its grade. For each of these hundred ton lots the local yardmaster gave to the depositor his certificate, and upon that certificate, when forwarded to the New York office, the Storage Company issued to whom the Furnace Company might direct its several warrants for each of such lots, which warrants described the iron covered by it, and stipulated that "this company has received into its storage yard, located as above, and entered in its storage books in New York in the name and subject to the order of (name of holder) one hundred tons of 2,240 pounds each of pig iron of the brand, grade and weight represented by this warrant, which will be delivered free on board cars in the yard above named, only on surrender of this warrant at the New York office, properly endorsed and witnessed, with payment of charges as noted below." The storage yard system was availed of by the Furnace Company for the purpose of borrowing money on the security of its unmarketed iron, the warrants for which could be conveniently used as evidence of a pledge of iron to secure its notes. In some instances of borrowing the Storage Company and its yard were not resorted to, and the iron was delivered elsewhere in pledge to the lender independently of the Storage Company. Besides other investors who from time to time made loans to the Furnace Company upon the security of storage warrants, was the Storage Company itself. In this way it became the pledgee of its own warrants, representing about 2,100 tons of iron in its yard 38.

Until May 26th, 1894, E. T. Peter was the Storage Company's local yardmaster. He was also a director in and the manager of the Furnace Company. On May 21, 1894, he, as a director in the Furnace Company, claiming to act by authority of its board of directors, filed a bill

against that company and one of its creditors, alleging among other things its insolvency and consequent inability to continue business, and praying among other things for the appointment of a receiver of its property and for the adjustment of its debts.

Under that bill T. J. Peter, who was the president of the Furnace Company, and the father of that complainant, was appointed receiver, and as such took charge of the Furnace Company's unpledged property, and subsequently where a question arose involving the validity of the warrant pledges, he, acting under orders of the court, took charge of the Storage Company's yard and the iron therein, consisting of about 10,300 tons.

The filing of that bill was followed by the filing in the same court of three others including the present one, wherein different creditors of the Furnace Company sought to reach its property, one of them charging that the first suit was brought collusively to hinder creditors. To each of these suits the receivership was extended under chancery rule 112. While they were pending two intervening petitions were filed, one by R. H. Pfaff, setting up a claim as pledgee of the Furnace Company to 700 tons of iron held by the receiver in the storage yard, and the other by L. and E Lamar, Minthorne Woolsey and Frank Moore claiming a lien by receiver's certificates on iron manufactured by the receiver.

From a decree on demurrer to one of the original bills an appeal was taken and was determined in this court. See *McKeever v. Ala. Iron & Steel Co.*, 112 Ala. 134.

In October, 1897, each of the original suits except the present one was dismissed without trial but without prejudice to the intervening petitions referred to; and they, together with this suit, were tried and decreed on jointly, and are jointly involved in this appeal.

During the pendency of the several suits, upon petitions of the appellant Storage Company and other warrant holders, orders of court were made and carried into effect, paying the several warrant holders except the Storage Company, by sales to them of the iron apparently covered by their respective warrants. Under the same decretal orders, the Storage Company was like-

wise paid in part but 1,300 tons of iron was reserved to abide the final decree, 700 of same to stand in lieu of that claimed under this original bill, and the remainder in lieu of that claimed by the intervenors.

Joseph Verchot brought this suit and thereafter he having died, it was revived in the name of his executrix. It seeks to enforce a pledge of 700 tons of iron alleged to have been made to him by the Furnace Company as security for money loaned on its seven notes each reciting a pledge of 100 tons of designated iron and further reciting that "any excess in the value of said collaterals or surplus from the sale thereof beyond the amount due hereon shall be applicable upon any other note or claim held by the holder hereof against us now due or to become due or that may hereafter be contracted." It is alleged in substance that after the iron was so delivered in pledge it was under the direction of the furnace company's president wrongfully removed into the storage warrant yard where interests in it were claimed by other parties defendant.

The demurrer to the bill was properly overruled. Verchot not having possession of the iron could not pursue the ordinary way of enforcing his security by a sale of the iron, and his sale if it could be made would be embarrassed by the conflicting claims upon it. In such case equity has jurisdiction to determine the rights of rival claimants and to enforce the pledge by judicial sale.—3 Pom. Eq. Jur. § 1231; 18 Am. & Eng. Encyc. Law, 674; *Sharp v. Bank,* 87 Ala. 644; *Freeman v. Freeman,* 17 N. J. Eq. 44.

There was nothing in the pendency of other creditors' bills to preclude him from proceeding by original bill instead of by intervention under those bills.—*McKeever v. Ala. Iron & Steel Co., supra.*

. The statutes requiring chattel mortgages to be in writing and authorizing their registration have no application to a pledge. A pledge differs from a mortgage in that the pledgee must have possession and the pledgor the legal title of the property, while a mortgage passes the title to the mortgagee and may allow possession to

remain in the mortgagor.—Jones on Pledges, §§ 4, 7;. *Geilfuss v. Corrigan,* 37 L. R. A. (Wis.) 166.

Notice to the public of the pledgee's interest in the property is sufficiently given by the possession which must reside in the pledgee. Such possession, however, to be effective either for notice or to give validity at law to the pledge must be complete, unequivocal and exclusive of the pledgor's possession in his own right. Jones on Pledges, § 40; *Casey v. Cavaroc,* 96 U. S. 467;. *First Nat. Bank v. Caperton,* 74 Miss. 857; 60 Am. St. Rep. 540.

As bearing on the question of what constitutes such possession the reported cases are numerous; but those which can be relied on as express authority are few, since each case is determined upon its peculiar facts.

In this case it is clearly proven that under the agreement of pledge between the Furnace Company acting by its president and Verchot, a particular spot of ground belonging to that company and located apart from its own iron yards was tendered by the president and accepted by Verchot for his use and that a quantity of iron was placed thereon, piled in 100 ton lots and marked with paint with Verchot's initials. There is nothing to show that any power was reserved or allowed to the Furnace Company or its officers or employes either to repledge, sell, use, or have charge of the iron after it was so placed.

It was not essential for the delivery to be made at the time of the contract and the pledge took effect upon subsequent delivery made in performance of the contract. *Nobles v. Christian-Craft Grocery Co.,* 113 Ala. 220; Denis on Contracts of Pledge, § 136. Considering the character of the property involved, its delivery must be taken as vesting complete possession in Verchot thereby validating the pledge. The cases of *Allen v. Smith,* 10 Mass. 308, and *Summer v. Hamlet,* 12 Pick. (Mass.) 76, may be referred to as analogous in principle.

It is proven that T. J. Peter, president of the Furnace Company, had active charge of its affairs and that by his direction iron was taken from the Verchot yard and placed in the Storage Company's yard, and there is noth-

ing to show that Verchot ever authorized or ratified such removal excepting a statement attributed to T. J. Peter, which is hearsay and for that reason incompetent as ·evidence.  There is, however,. evidence tending to show that contrary to the Storage Company's printed rules its yard master had in some instances given certificates upon which warrants were issued to and pledged by the Furnace Company representing deposits of iron in the ·storage. yard before they were actually made. .The. necessity for supplying the shortage thus created for which E. T. Peter, the yard master, might have been held responsible to the Storage Company, furnishes a probable motive for so using the iron' in ·controversy. .It may be that the Peters expected that Verchot would ratify such removal upon restitution made to him from iron to be manufactured, but there is no proof of such ratification.   On the contrary,· there is evidence tending to show that on being· informed of the· removal he objected and held to his original contract.

As to the quantity of iron delivered to Verchot on the yard assigned to him and likewise as to the quantity thence removed into the. Storage Company's yard the ·evidence is not clear.   Those matters being· referred to the register he ascertained that the entire 700 tons were ·so delivered and removed.   The testimony is not in accord as to the quantity removed, neither does it accord as to the time of removal, and the weighing books in ·evidence are not shown to have been accurately kept. The testimony can be best harmonized upon the supposition that removals in different quantities occurred at ·different dates and that all of such acts of removal were not known to each witness.   So viewed the evidence supports the register's findings.

The demurrers to the intervening petitions show no tenable grounds.   Such petitions are not required to ·conform to all the technical rules applicable to pleading as between the principal parties.   When ·filed by leave ·of court other parties in interest are entitled to notice and an opportunity to defend, but the petition need not name them as defendants and it needs no formal prayer ;for process.

Pfaff's petition presents a case for the most part similar to that of Verchot. He claims as the holder of notes containing agreements for pledges of iron as collateral security transferred to him by C. S. Plumb who is alleged to have made loans thereon to the Furnace Company aggregating $5,000. There is evidence amply supporting the petition and showing that pursuant to the contracts, iron was set apart to Mrs. Plumb by being placed upon a spot of ground leased to her by the Furnace Company for that purpose, and was there marked with initial of her name. There is no evidence of any right reserved or allowed to the Furnace Company or any one connected with it to thereafter use or exercise any control over the iron. This delivery vested Mrs. Plumb with possession and in that respect fully executed the pledge contract.

It was ascertained by the register upon a reference that 300 tons of iron was by direction of the Furnace Company's president removed from the Plumb yard into the Storage Company's yard and that 200 tons of same remained on that yard the warrants describing same being held by the Storage Company, and that a warrant describing the other 100 tons had been issued to an innocent holder for value, and that this last mentioned 100 tons had been removed from the State but that there had been another 100 tons substituted and held in lieu of it in the storage yard.

Though a pledgee does not acquire the legal title to the pledged property, and though relinquishment of his possession will ordinarily defeat the pledge, yet the pledgor cannot accomplish such defeat by wrongfully retaking possession—*Way v. Davidson,* 12 Gray (Mass.) 466; *Palmctag v. Doutrick,* 59 Cal. 154. Verchot and Mrs. Plumb, in whose place Pfaff now stands, being without fault, might have recovered possession from the Furnace Company when the iron was taken by it or its representatives from their respective yards; and the same right of action lay against the Storage Company after it was held in its yard. Neither the Storage Company nor its warrant holders, either with or without notice of the pledge, could acquire any greater interest

than their transferor the Furnace Company had, which was only to have the property after satisfaction of the debts it was pledged to secure.—*Burton v. Curyea*, 40 Ill. 320, 89 Am. Dec. 350; *Solomon v. Bushnell*, 11 Oregon, 277, 50 Am. Rep. 475. The statute—Code, § 4222—regulating the issuance of warehouse receipts was not intended to confer rights upon their holders prejudicial to one whose property is stored without authority. *Commercial Bank v. Hurt*, 99 Ala. 130.

The Lamar, Woolsey and Moore petition involves only matters pertaining to the receivership. Receiver's certificates were issued by T. J. Peter the first receiver, pursuant to a decretal order authorizing him to borrow money thereon, to pay charges and make repairs on the furnace property and to convert accumulated raw material into iron, and providing that the certificates should be a lien on the iron to be made by the receiver and its proceeds. These petitioners intervened in the original suits as owners of certain of these certificates, for the protection and enforcement of their respective liens on the remaining receiver made iron, which except about 40 tons they alleged had been wrongfully placed in the Storage Company's yard by the receiver.

Upon a reference to the register he ascertained that about 300 tons of the receiver made iron had been so placed during the administration of receiver Peter. After examination of the evidence taken and reported by the register, we cannot affirm that he erred in this conclusion. Upon that and other issues submitted to the register evidence documentary and oral was taken and appears voluminously in the record. It would be profitless here to discuss it in detail or to pass specifically upon objections to parts of the evidence. The rule is settled that the admission by the register of incompetent testimony, will not reverse a decree which is supported by competent testimony, and that the findings of the register upon testimony taken before him will not be set aside when like testimony would support a jury's verdict.

Whether the chancery court has power in cases like the present to subordinate pre-existing liens to those of

receiver's certificates is a question referred to in argument, but it does not arise here. The storage warrant holders had no lien on the receiver made iron. The receiver was given no power to create liens in their favor.

To preserve and make valuable the Furnace Company's property the court had power in the interest of that company and its creditors to direct the discharge of threatening incumbrances and to have its accumulated raw material changed into a marketable product. *Beckwith v. Carroll,* 56 Ala. 12. It could authorize its receiver to contract debts for such purposes even without the issuance of certificates and to make them a charge upon the furnace property.—*Thornton v. H. A. & B. R. R. Co.,* 94 Ala. 353. It had likewise power to designate a mode for borrowing and for repayment of the money out of the iron to be manufactured by its use, and to transfer the lien so created to other iron which by the order of the court, acquiesced in and acted upon by the parties, had been substituted for that allowed to be removed from the yard.

We discover nothing inequitable in the apportionment made by the decree of expenses incident to the receivership. The evidence shows that those expenses were reasonably incurred by the receiver chiefly in affecting the issuance and registration of the second series of receiver's certificates issued at the instance of the appellant Storage Company among others, and in employing a watchman to guard not only the furnace property but iron in the storage yard which may have been as expressed by the appellant's petition for its sale "in danger of being taken away by irresponsible parties." It was proper to prorate such expense between the two companies according to the value of their respective properties needing such protection.

In the matters assigned for error there is nothing which should reverse the decree. It will be affirmed at cost of the appellant Storage Company.